# HAWAIIAN COMMERCIAL & SUGAR COMPANY *v.* WAILUKU SUGAR COMPANY.

## APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED DECEMBER 23, 1903.      DECIDED JUNE 2, 1904.

### FREAR, C.J., GALBRAITH AND PERRY, JJ.

The surplus water of an ahupuaa, meaning thereby the water, whether storm water or not, that is not covered by prescriptive or riparian rights, is the property of the konohiki, to do with as he pleases, and is not appurtenant to any particular portion of the ahupuaa.

No part of such surplus water passes as an appurtenance under a deed of a portion of the ahupuaa not bordering on any stream nor having any streams or springs within it.

By the judgment in the case of *Lonoaea et al. v. Wailuku Sugar Company et alt.*, 9 Haw. 651, 665, 666, *all* of the prescriptive rights to water then owned by the respondent were adjudicated and awarded to it.

By the term "its present estate", used in that judgment, was meant only the 984 acres of respondent's land then in cane or which had been theretofore planted in cane, and not all of the available cane land then owned by the respondent.

By that judgment the respondent was not awarded all the water in the

Wailuku stream during the day irrespective of the quantity in the stream.

That judgment excluded night water and Sunday day water as not belonging to the respondent by prescription.

With reference to water which had been used adversely for less than the statutory period, the institution of proceedings and the judgment in the *Lonoaea* case interrupted the running of the statute, and the period of prescription would have to commence anew thereafter. The adverse user had before the judgment cannot be tacked on to that, if any, had after that time so as to ripen into title.

The judgment in the *Lonoaea* case awarded to the respondent "the water for its present estate from these auwais" (meaning the various large auwais then leading from the Wailuku river) "on each day of the week, excepting Sunday, from 4 o'clock a. m. to 4 o'clock p. m., the dams to be kept substantially as they are at present, composed of loose stones and dirt." "The water for its present estate" thus awarded means the water needed, without waste, for the 984 acres, constituting the respondent's estate at the time of the institution of that suit, if cultivated in cane, limited, however, to the quantity flowing in the auwais as they were at that time and diverted by the dams kept substantially, as to height, composition and otherwise, as they then were, and limited further to the days and to the hours named in the judgment. This may include the water of freshets, small or large, provided it is thus needed and only to the extent that it is thus needed and always with the limitations mentioned as to time of taking and capacity, etc., of dams and ditches.

It does not necessarily follow from the mere fact of a discontinuance of irrigation of land to which water rights are appurtenant, that the right to the water is abandoned. Whether or not there has been such abandonment is a question of intent, to be determined upon all the evidence.

Under the judgment above quoted, the respondent was awarded water for the purposes of its sugar mill.

The water flowing from a tunnel dug by the respondent on its estate since the date of the *Lonoaea* judgment is now owned by the respondent in addition to the water to which it is entitled under that judgment.

Water may be diverted from lands entitled thereto to other lands, provided such diversion can be accomplished and to the extent only that it can be accomplished without injury to the rights of others.

Where an attempt is made to so divert water, the burden is upon the
party making such attempt to prove that the diversion is without
injury to the rights of others; and if the proof is not such as to
satisfy the court of the harmlessness of such diversion, the diver
sion will be enjoined.

The rights of the Wailuku Sugar Company in the waters of the Wai-
luku stream declared and an injunction ordered to issue restrain
ing it from continuing certain illegal diversions of water shown to
have been committed by it.

## OPINION OF THE COURT BY PERRY, J.

The bill is for an injunction to restrain alleged illegal diver-
sions of water from the Wailuku Stream, Maui. Upon a plea
in bar, interposed by the respondent, this court on appeal has
decided to what extent the judgment in *Lonoaea et al. v. Wai-
luku S. Co. et alt.,* 9 Haw. 651, which judgment is binding upon
the present parties, has determined the several matters now in
controversy, 14 Haw. 50.

After the ruling upon the plea, the circuit judge, with the
consent of the parties, appointed a commissioner and directed
him to take evidence and to make findings upon certain stated
issues and to report to the court the evidence so taken and the
findings so made. The commissioner, after an examination of
the *locus in quo* and the taking of evidence, a transcript of which
covers 892 typewritten pages, presented a lengthy report. The
circuit judge thereafter dismissed the bill, not stating, however,
the reasoning upon which his conclusion was based, and neither
affirming nor setting aside, expressly, any of the findings of the
commissioner.

To the descriptions of the *locus in quo* with its dams and
ditches, old and new, contained in the decision in the *Lonoaea*
case and in that upon the plea in bar, 14 Haw. 50, may be added
the general description of the Ahupuaa of Wailuku given by the
commissioner (Report, p. 4), reading as follows: "The Ahu-
puaa of Wailuku contains as near as may be estimated, an area

of 28000 acres, which may be divided into three principal sections:

"First. An upper great valley (Iao) oval in shape, having a length of about 4 miles and greatest width of about 2 miles, and an area of about 4600 acres. The valley is almost entirely surrounded by high mountain walls, attaining at highest point an elevation of 5788 feet above sea level. The Wailuku River has its source in this valley and emerges therefrom through a long narrow gorge to the lands below.

"Second. A lower section which includes the Wailuku Commons (Spreckelsville, etc.) and the lands below the Wailuku Sand Hills having an area of about 19500 acres.

"Third. A central section which includes the river bed and flat bottom lands adjacent, (constituting a lower shallow valley), from the gorge of the upper valley to the sea; including also the easy slopes between the foot of the mountains and the sand hills and extending to Waiehu on the North and to Waikapu on the South. It includes also a considerable mountain portion lying outside of the upper valley.

"Within this central section are all of the cultivated lands of the Wailuku Sugar Co. and practically all of the taro lands of Wailuku.

"Estimate of the ownership of lands in the Ahupuaa of Wailuku, shows:

"Owned by Hawn. Com. & Sugar Co. . . . . . 24541.73 Acres
"Owned by Wailuku . . . . . . . . . . . . . . . . 3080.73 "
"Owned by other parties . . . . . . . . . . . . . 377.54 "

"Total . . . . . . . . . . . . . . . . . . . . . . . . 28000.00 Acres"

A copy of the commissioner's map, showing these three main subdivisions, here follows:

Sc. 15000 ft to inch.

The waters in controversy may be divided into three classes: (1) those of the ordinary flow of the Wailuku stream; (2) those of ordinary (small) freshets, which come about once in ten days; and (3) storm waters (large freshets). These again may be divided into two classes: (a) surplus water, meaning thereby, as defined in 14 Haw. 61, the water, whether storm water or not, that is not covered by prescriptive rights and excluding also riparian rights, if there are any, and (b) water which is covered by prescriptive rights. The water flowing from a tunnel dug by defendant on its own land in 1901 and said to be sufficient to water 65 acres of cane, is not included in any of these divisions because it is not in controversy. It is undisputed and clear that such tunnel water is the property of the defendant and may be used by it as it sees fit. We shall first treat of the rights of the parties in the waters of the stream and then consider whether or not the respondent has exceeded its rights to the injury of the complainant.

Surplus water. This, in our opinion, is the property of the konohiki, to do with as he pleases, and is not appurtenant to any particular portion of the ahupuaa. By ancient Hawaiian custom this was so. Originally the King was the sole owner of the water as he was of the rest of the land and could do with either or both as he pleased. In later years, the rule seems to have been for him not to dispossess tenants of their lands except for cause and to that extent, perhaps, he would not have deprived cultivators of the water to which their lands were by usage entitled. But no limitation, so far as we can learn, ever existed or was supposed to exist to his power to use the surplus waters as he saw fit. There is no reason for supposing that such water was regarded as appurtenant to one portion of the arable land of an ahupuaa and not to another portion or for supposing that it was appurtenant to the arable land and not to the remainder of the ahupuaa. During recent years konohikis have in many instances diverted from the ahupuaa the surplus water either wholly or in large part. An argument based upon public policy or upon the necessity or wisdom of encouraging the cultivation

of the soil upon a scale unknown and impossible in ancient times, cannot be of assistance, for a determination that the surplus water belongs, in accordance with ancient Hawaiian custom, to the konohiki is not less in favor of an enlarged measure of cultivation than would be a determination that such water belongs to the present holder of a particular portion of the ahupuaa.

This was the view entertained by Chief Justice Allen thirty-seven years ago and expressed by him relative to this very ahupuaa in the suit of *Peck v. Bailey* (8 Haw. 658, 661, 662, 663, 671), the parties in which were the predecessors in interest of the present respondent. "There can be no difference of opinion," said that judge, "that the complainants were entitled to all the water rights which the lands had by prescription at the date of their title. By the deed, the water courses were conveyed and a right to the water accustomed to flow in them. The same principle applies to all the lands conveyed by the King, or awarded by the Land Commission. If any of the lands were entitled to water by immemorial usage, this right was included in the conveyance as an appurtenance. An easement appurtenant to land will pass by a grant of the land, without mention being made of the easement or the appurtenances. But if lands had no such rights, and no additional grant of water rights was made, it certainly could take nothing by having been a portion of the Ahupuaa. * * * * *

"The complainants contend that they have the right of lord paramount to the Wailuku river. The grantor of a large portion of the complainants' land had the same right as his ancestor, who was the konohiki of this Ahupuaa, subject to the rights of tenants, which were afterwards confirmed by the Land Commission. These rights were certain taro patches and the water necessary for their cultivation. This was a limitation to the entire control of the river.

"The grantor of complainants has conveyed portions of this Ahupuaa to several persons. Each grantee will hold all that has been conveyed to him, unless it should conflict with a previous conveyance. This includes the water courses on their lands, and all the water which the lands had enjoyed from time immemorial. The deeds to defendants were from the same source

originally and conveyed similar rights and privileges as appurtenant. So it appears by the deeds to the complainants and defendant, that a large part of the Ahupuaa has been conveyed to them by the konohiki, with all the rights and privileges appertaining. By the evidence it appears that there are large valuable water rights appurtenant to these lands. It is very evident, therefore, that the complainants cannot be lords paramount over the Wailuku river, but they have certain valuable rights of water as an appurtenance to the land conveyed to them, and nothing more. They cannot claim any rights except what they have acquired by their deeds and leases, and the defendant is in the same category. Both are limited in their rights of water, and there is not the slightest ground for declaring either as lord paramount; as much reason, as a matter of principle, in the one case as the other. The difference consists merely in the far greater possessions of the complainants. * * * *

"The water courses on this Ahupuaa have existed from time immemorial, and were doubtless made by the order of some ancient King, and when the late King conveyed these lands to the proprietors, the rights of the water courses, in this full enjoyment, was included as an appurtenance. While the King owned this Ahupuaa, he had a right to apply the water to what land he pleased, but after the water courses were made, more especially after being in use from time immemorial, his conveyance of the land would include them, the same as his conveyance of the land bordering on the Wailuku river will include the rights of water in said river, which had not been before granted."

In this case the respondent or its predecessors in interest acquired by deed from Kamehameha IV, dated April 21, 1863, prior to the deeds and patent under which the complainant holds, 1375.52 acres of the kula land of the ahupuaa, not bordering on the stream nor having any springs or streams in it. The respondent claims that under this deed it acquired as an appurtenance of the land surplus waters of the ahupuaa. Just what part of such surplus is claimed is not entirely clear, although in theory it seems to be as much thereof as is necessary and available for the proper irrigation in cane of the land so purchased. This, in effect, judging from the figures and detailed arguments urged, would seem to be all or practically all of such surplus. The respondent does explicitly contend that none of such surplus.

can be used by the konohiki on the lower section of the ahupuaa with its 19500 acres composed in very large part of arable land, and that all is appurtenant to the central section. Whatever respondent's precise claim on this point may be, in our opinion no part of the surplus water, as such, of the ahupuaa passed under the deed in question.

Water covered by prescriptive rights. As to this, the judgment in the *Lonoaea* case is a complete adjudication. As already decided on the plea in bar, the rights in the surplus water were not adjudicated. In our opinion, *all* of the respondent's prescriptive rights were adjudicated, including in the term prescriptive as here used the rights appurtenant to taro land. The right of taro lands to water has generally, if not always, been regarded and referred to by our courts as well as by parties as a prescriptive right acquired against the konohiki in the manner in which such rights can be acquired. In the decision on the plea in bar the term was so used.

The oft-quoted judgment in the *Lonoaea* case is as follows: "that the plaintiffs excepting those whose rights are specially considered herein above are entitled to such amounts of water as they have acquired by prescription for their various lands during the night from 4 o'clock p. m. to 4 o'clock a. m. of each day from the various large auwais leading from the Wailuku river; that the defendant corporation, the Wailuku plantation, is entitled to the water for its present estate from these auwais on each day of the week, excepting Sunday, from 4 o'clock a. m. to 4 o'clock p. m., the dams to be kept substantially as they are at present, composed of loose stones and dirt; the defendant corporation to carry out this order." Just what prescriptive rights were considered and included in this award can, perhaps, be best ascertained by stating first what rights the respondent in the present case relies upon in justification of its acts. In addition to the tunnel water and the water (surplus) the right to which was not acquired or claimed to be acquired by prescription, the respondent's claim is that it is entitled to (1) the water rights of 488.929 acres of ancient taro land owned in fee and leased

by it; (2) water rights acquired by prescription in favor of all or the greater part of 574.89 acres of kula lands, situate below the old ditches; (3) the prescriptive rights, confirmed by the Lonoaea judgment, to water "its present estate", 984 acres, in cane; (4) the right to 2-5 of the water of Kama auwai, secured by the judgment in the Bailey-Wilfong suit, under its purchase in 1877 of the lands to which such 2-5 was awarded; (5) the right to water at night 100 acres of taro lands purchased within 20 years next preceding the institution of the *Lonoaea* suit and in favor of which the right to use water *by day* is now claimed not to have accrued, a right to water by night being claimed. It is apparent that these rights claimed overlap to a greater or less extent.

The rights appertaining to the taro lands held by the respondent in 1894 whether in fee or under lease, were included in the award made as contributing to the right to water "its present estate." The same is true of the right claimed to have been acquired by prescription to water 574.89 acres of kula land and of 2-5 of the water of Kama auwai, in addition to the right to water "its present estate." The former judgment limited the water awarded for "its present estate" at a time when the defendant had 984 acres of cane land in cane and ploughed for cane, as testified to by its manager, and none in taro, and necessarily limited in another way the area of land which the respondent had a right to irrigate by declaring that the right was to take water "from these auwais" (meaning those then in existence) and thereby excluding all land above the Kalani and Kama auwais except in so far as water might lawfully be taken to it in exchange for lands below upon which irrigation might be discontinued. The court by its judgment, further, very clearly disallowed any claim on the respondent's part to water 100 acres or any other area of taro or cane land *at night,* for it awarded to the plaintiffs the right to water every night of the week, not excluding Sunday as it did with the respondent, thus indicating an intent to confine the respondent in its use of the water (prescriptive) not only to the daytime but also to six out of the seven

days of the week. This disallowance to the complainants and to
the respondent respectively of any rights in the time of its oppo-
nents was urgently asked for by the respondent in that case as
an examination of its brief will show.

Those various claims were in fact all considered in the *Lono-
aea* case. The commissioner in that case said in his decision that
"the defendant claims title by prescription to all the waters of
the river in the daytime, say from 4 a. m. to 4 p. m., and there-
fore the right to use the water between those hours to suit its
own requirements and convenience." So far as day use was
concerned this claim was as broad as respondent could well make
it, for if it obtained *all* the water in the stream it could not ex-
pect to get more from that source. The respondent admits in
its brief in this case that in the former case it sought "in a half-
hearted way" to tack the water rights acquired between 1873
and 1893 to its right to use water during the day. The attempt
was evidently successful. It is true that Associate Justice Frear
said in his opinion, "Further, the company has the right to water
at night for many pieces of kalo land which it has acquired in
recent years and which are not cultivated in cane", but Mr. Jus-
tice Frear dissented, in part, from the majority and in making
that finding and ruling he was stating one of the points whereon
he differed from them. Notwithstanding this express statement
by the dissenting justice, the majority chose not to refer to the
point in its reasoning and so framed its judgment as to disallow
to the respondent prescriptive night water for those or any of
its taro lands, thus adopting the respondent's view that, for the
sake of a peaceful and more effective enforcement of the rights
of each, the complainants should be confined to a use of the water
at night and the respondent to a use of the water by day.

The claim for the water rights of the respondent's ancient taro
lands was presented, 404.80 acres being the total then claimed
in fee simple and 75 to 100 acres under lease—a larger area
than was in fact then owned or leased by it as shown by the evi-
dence in the present case. The same is true of the prescriptive
rights in favor of "large areas of land, to-wit, most all of the

crown sales in the valley which have been in cane for over twenty years and may be presumed to have acquired water rights"; and of the right acquired through the Bailey-Wilfong decision to 2-5 of the water of Kama 'auwai, an award as to which counsel at that time conceded that "there can be but little doubt but that this was an inordinate proportion of the auwai."

Whether the evidence then presented and the law would have justified a judgment for more prescriptive water in respondent's favor, is a question not now open to consideration, although it might be added that the court may have been of the view that if it measured the allowance to the respondent by the total of its various detailed claims in favor of the specific parcels of land named it might be awarding to it more than the Wailuku stream carried and hence made use of another method of limiting and describing the extent of the respondent's rights. Where water has been transferred to kula land from ancient taro lands, the proprietor, after the use on the kula lands has continued for the statutory period, is too likely to be led to indulge in the view that the kula has acquired a prescriptive right to the water and that the taro lands have at the same time retained their ancient right and not lost it by abandonment. That, of course, is a mistaken view. Water rights cannot be doubled in that way. In the *Lonoaea* case the court, in making its estimate of the total of respondent's rights, doubtless sought to avoid committing that mistake.

It is further contended for the respondent that by "its present estate" the court meant not only the 984 acres then in cane or which had been theretofore planted in cane but also all other available cane land then owned by the respondent. This cannot be sustained. In the first place, as already pointed out, the limitation of the right to take "from these auwais" necessarily excludes the view that any land above Kalani and Kama could be regarded as a part of that estate. Secondly, an important point in the controversy was whether respondent was using more water than it was entitled to and in its defense the respondent made great efforts to justify the watering of every portion of the

area which was then watered. Several methods were suggested for justifying the watering, for instance, of the 120 acres of new kula land from the Kalani flume, each involving and being based upon the discontinuance of the use on some other land of an equivalent quantity of water. Both the majority and the minority of the court likewise very carefully went into the question of how such new use could be justified. Why all this, if respondent's "present estate" was to include all land then owned by it? If respondent's present view of what the court intended to award were correct, all that would have been necessary to ascertain on that point of the 120 acres would have been the fact of ownership of that cane land. Moreover, this point has been expressly passed upon in the decision on the plea in bar. "The words 'for its present estate' must have some meaning. They must limit the amount of water to that theretofore used or at least to that needed on such estate. In either case if the defendant wished to irrigate by day additional lands that had no water rights it could do so only by using thereon water that might otherwise be used or needed on the old estate. It could not, so far as that decision is concerned, use additional day water even though there were an abundance of it."—14 Haw. 62.

The respondent's contention that it was awarded all the water in the stream during the day, in support of which it is argued, among other things, that the court said in its opinion in the Lonoaea case, 9 Haw. 665, that "Having sustained the claim of the defendant corporation to the use of this water during the day, it is of no importance whether the main auwais (Kalani and Kama) have been enlarged," has been already definitely disposed of. "It thus appears that the defendant was adjudged to be entitled during certain periods to 'the water *for its present estate* from these auwais.' This does not mean that it was entitled for use on its then estate to all the water in these auwais, much less to all the water in the stream. It means that it was entitled, during certain hours from these auwais, to the water for its then estate, that is, that it was entitled to take from these auwais during these hours all the water that its then estate had by pre-

scriptive right.  \*  \*  \*  The decision could not in the nature of things have had reference to all the water, not only because the auwais in question were not large enough to carry all the water in times of plenty, but also because the rights adjudged,— whatever they were, were adjudged solely with reference to adverse user, and therefore they could not have extended beyond the user—which did not include all the water in times of plenty. \*  \*  \*  We may add also that the controversy arose in a time of drought and that this fact was prominently before the court and that the rights in question were spoken of with reference to dry and ordinary times as distinguished from times of plenty. The prescriptive day right might cover all the water in the stream in dry times, but that would be, not because it covered all the water however much there might be, but because it covered a certain amount and there was not more than that amount in such times.  \*  \*  \*

"Nor does it follow as a matter of law as a necessary inference as distinguished from the actually intended decision, that all the water in the stream including surplus water was adjudged to belong to the defendant during the day, because the majority of the court based its decision on the ground that the exercise of the defendant's right by day could not diminish the plaintiffs' supply by night.  If all rights, prescriptive and other, had been involved, that conclusion could be supported only on the premise that all the defendant's rights were day rights and all the plaintiff's rights were night rights; but since prescriptive rights only were involved, the conclusion as to such rights only would follow from the premise that the defendant's prescriptive rights only were all day rights and the plaintiffs' prescriptive rights only were all night rights.  And, as indicated above, the same would be true as to a portion only of the prescriptive rights, provided the remainder were not interfered with, and such was the opinion of the majority of the court for certain exceptions as to the day right were expressly held in favor of certain other parties." —14 Haw. 61, 62, 63.

The words "from these auwais", like the words "from the

various large auwais leading from the Wailuku river" and the words "the dams to be kept substantially as they are at present, composed of loose stones and dirt," cannot be regarded as words of mere comment, as urged by the respondent, or as idle words used for no purpose, but were inserted by the court in the statement of its conclusion or formal order for the express object of aiding in a definite statement of what the rights of the parties were.    Respondent's counsel seems to be under the impression that we have held that the "various large auwais" includes only the Kalani and Kama and the Mill Ditch.    We are not aware that it has been so held and are of the opinion that by the *large* auwais the court meant *all* the auwais leading from the river as distinguished from the lesser distributing ditches tributary to them.    Any use of the water from the new auwais can be legally made only if it does not violate the requirement of the well established rule that such diversion shall be without injury to the rights of others.

To surplus water, as above defined, the respondent has not acquired any title by grant.    The claim is made, however, that the respondent has by adverse use acquired the right to Sunday water, night water other than that needed by the holders of the taro lands and day water other than that needed and used on the respondent's former estate.    We do not understand that in the *Lonoaea* case the court in framing its judgment declared a part only of the prescriptive rights which the defendant had theretofore acquired or that it intended to leave the respondent at liberty to claim thereafter that it had other or greater prescriptive rights not subsequently acquired.    It declared *all* of such prescriptive rights and defined and measured their sum total by the wording of its judgment.    In that judgment it expressly excluded Sunday water and night water as not belonging to the respondent by prescription, although respondent at the time claimed both by prescription, the Sunday water from 4 a. m. to 10 a. m. to offset the quantity taken by day by Wailuku residents for domestic purposes and for the remainder of the day, apparently, under the head of surplus water.    From the

institution of the Lonoaea suit until this proceeding was brought, less than ten years elapsed and it was impossible for the respondent to have acquired during that period any new rights by prescription. Nor can any adverse user had before the *Lonoaea* judgment be tacked on to that, if any, had after that time so as to ripen into title. The former proceedings and the judgment interrupted the running of the statute and the period of prescription would have to commence anew. The weight of reason and some of the more recent authorities are in support of this view.

Another question is as to just how much is included in the award to the respondent of "the water for its present estate". Does this mean the water then *used* on or that *needed* for its estate and is it confined to the ordinary flow of the stream or does it include any freshet water? It means the water needed, without waste, for the 984 acres, constituting the respondent's estate in 1894, if cultivated in cane, limited, however, to the quantity flowing in the auwais as they were at that time and diverted by the dams kept substantially, as to height, composition and otherwise, as they then were, and limited further to the days and to the hours named in the judgment. In times of ordinary flow or of scarcity, all of the water may be taken by the respondent if all' is needed for the purpose stated; and the water of the freshets, small or large, may also be taken if they are thus needed and only to the extent that they are thus needed and always with the limitations already mentioned relating to hours and to capacity, position and nature of dams and auwais. More than this the respondent is not entitled to. The remainder, subject to other prescriptive rights, belongs to the konohiki, the complainant.

Much has been said by the respondents concerning the ancient right of taro lands to a portion of the storm or freshet waters for the purpose of flushing out the patches and thus aiding in a healthy growth of the taro. The equivalent of this is practically recognized in the judgment, as here interpreted, in its allowance of freshet waters or a portion thereof for the cane if

needed. That ancient flushing right was itself, necessarily, subject to the same, if not greater limitations concerning the capacity, etc., of dams and ditches.

Some minor points will now be referred to. The complainant contends that the water rights of certain ancient taro lands owned by the respondent have been abandoned and have reverted by operation of law to the konohiki. The commissioner found "that about 53 acres of original taro land has been abandoned for cultivation and irrigation under conditions suggesting that such abandonment is permanent", but declined to "pass on the ultimate intention of the defendant as to these lands." Whether or not the rights have been abandoned, is a question of intent. It does not necessarily follow from the discontinuance of irrigation of land to which water rights are appurtenant that the right to the water is abandoned. It may be and often is the fact that the discontinuance is merely for the purpose of using the water on other lands. If there is any one thing in this case that is entirely clear, it is that the respondent has never voluntarily surrendered any water rights. Upon the whole evidence we find that there has been no abandonment of the rights appurtenant to the 53 acres under consideration.

Respondent at the date of the *Lonoaea* judgment held 19.84 acres of taro land under lease from the complainants. That lease has now expired and it is contended for the complainant that the water rights of that land should not be regarded in this proceeding as belonging to the respondent. But the lease was still in force at the date of the bringing of this suit and it is the rights as of that date that we are considering. The contention, therefore, cannot be supported, although the area involved, with its water rights, could not be regarded as contributing to the respondent's water rights after the date of the expiration of the lease.

The complainant claims that the tunnel water developed and owned by the respondent, in so far as it is used at the mill, cannot be held to justify an increase of acreage by the respondent. The quantity of water so developed must be regarded as a net

gain over the quantity to which respondent was entitled under the *Lonoaea* judgment, because at the date of that judgment the respondent was using from the stream water for the same mill purposes and the judgment should, we think, be construed as awarding to the respondent the right to continue to take from the stream for those purposes.

The commissioner's report, as we understand it, shows that since 1894 the respondent has purchased 91.686 acres of taro lands and has sold about 3.654 acres of taro lands without reserving the appurtenant water rights, a net gain, apparently, of 91.032 acres of purchased taro lands; that at the date of the *Lonoaea* judgment it had under lease 72.45 acres of such lands; and that when this suit was instituted the total of such leased lands was 33.147 acres, a net loss of 39.31 acres of leased taro land with water rights. The report does not, however, state in summarized form how much, if any, of the land so purchased was held under lease by the respondent in 1894, how much, if any, of the land so sold was held by the respondent in fee or under lease in 1894, how much, if any, of the lands now under lease were under lease to the respondent in 1894, or how much, if any, of the land covered by the leases the terms of which have terminated in any way since 1894 was under lease to the respondent in 1894. In may be that the report contains sufficient data from which to obtain these results, but at best it is in complicated form. We prefer not to make findings on these points, as counsel have not been heard with particular reference thereto. Moreover, the parties may be able to agree as to the figures without the aid of the court. Nor do we decide now as to whether the rights appurtenant to the lands acquired or to those lost by the respondent since 1894 by deed or lease or termination of lease continue of the same character, concerning the time of taking, after as before the acquisition or loss. The point is one that has not been fully argued and, perhaps, not all the parties necessary to a complete adjudication on the subject are before the court. Further, there are intimations in the briefs that by common agreement or by acquiescence night rights

acquired by the respondent are treated as days rights and days rights lost by respondent are treated as night rights.

Has the respondent exceeded its rights since the former judgment? Hereunder, first, of the diversion at Maniania. The Maniania dam is situate at a point about one mile mauka from the head of Kalani auwai, about 1⅓ miles above the head of Kama auwai and still further, of course, from the head of the mill and other lower ditches. The commissioner found that under the bed of the stream from a point some distance above the Maniania dam to the sea is a stratum estimated at from 25 to 40 feet in thickness composed of loose boulders, sand and gravel, resting upon a lower stratum of material practically impervious to water. This gravel bed is urged by the complainant as constituting a subterranean reservoir from which at certain points water issues into the stream augmenting the supply of the latter. This theory rests largely upon expert testimony. Other expert testimony is to the effect that while such gravel bed exists the water from it passes underground to the sea and does not reappear at any point in the river bed. This latter theory is supported by the fact, clearly established, that in the absence of the ordinary surface flow no water in the nature of seepage or other springs has ever been known to appear in the bed of the stream. Upon the evidence, the respondent's theory as to the method of the discharge of the waters from the gravel bed is the correct one. And yet the undisputed existence of the gravel bed is of some importance in the determination of whether or not injury follows from the diversion at Maniania. The saturation of a portion of the gravel bed made necessary by the reduced level of the stream delays a certain portion of the diverted water when returned into the stream at Maniania. In consequence of this, of the distance between Maniania and the lower auwais and of other causes, the returned water necessarily requires time for its passage from the higher to the lower dams and through the lower auwais, the length of time so required varying, in accordance with the volume of the flow and its consequent rapidity, from forty minutes to an hour or more. The

respondent may avoid the injury which would result from such difference of time and yet divert some water, by exchange, to the new lands under that ditch, as, for instance, by returning the water into the stream at Maniania not at 4 p. m. but at an hour as much earlier as may be necessary so that, beyond doubt, the water will be at 4 p. m. in all its accustomed volume where it would be at such time but for such diversion at Maniania. If there is any difficulty in determining precisely the hour at which the water must be returned from Maniania in order to comply with this requirement, the respondent must overcome it by returning it at such an early hour that there can be no doubt of the fact of compliance, for the burden is upon it, if it desires a diversion to new lands, to make it without injury to others and to prove that it has been made if at all without such injury.

The respondent suggests that the loss to the taro lands due to its failure to return the water at Maniania before 4 p. m. is fully compensated by its failure to use its share of the night water appurtenant to the taro lands acquired by it since 1894. Assuming that such last named right has not been availed of by the respondent (the respondent's own evidence shows that it has been) the suggestion is one more properly for consideration by the parties by way of contract and can have no effect upon the *rights* as they exist.

It is urged by respondent by way of partial justification for what might otherwise appear to be transgressions on its part, that while it is entitled to take the water at 4 a. m. each day, its irrigators do not commence work until 6 a. m. and that the taro lands have the benefit of the difference. This claim is not substantiated by the evidence. While the irrigators are not at work before 6 o'clock, the tenders of the main ditches are at four and the water during those two hours is run into reservoirs for later use. However that may be, the respondent can easily run such water into reservoirs and in that way preserve the benefit of the judgment which it so vigorously sought in the

former case. Any change to a use beginning at 6 a. m. can be obtained now by contract only.

Another injury caused to the konohiki by the past method of diversion lies in the fact that freshet water has been diverted at Maniania at the same time that it has been diverted in the three main (old) auwais. It needs no argument to show that four ditches may carry more freshet water than three and the evidence indicates that the respondent has taken more freshet water through the four ditches together than it is entitled to take.

Thus far Maniania diversions by day only have been referred to. In view of what has been stated above, night diversions by that ditch could at most be lawfully made only by way of exchange from the taro lands and rights acquired since 1894. Such diversions cannot be made without injury to other taro lands. All the taro lands take their water by night; their right is to use the water jointly on every night,—although, as the evidence shows, a different permissive use has to some extent prevailed among the owners for some time. To permit the respondent to take its share at Maniania would be to lessen the quantity and consequently the rapidity of the waters flowing in the old auwais from which the other taro lands take their supply and this would be an injury to them. The respondent has since 1894 diverted water at night at Maniania.

Through the old auwais, as well as through Maniania, the respondent has since 1894 diverted water on Sundays, from 4 a. m. to 4 p. m., for irrigation, "at such time or times as it deemed necessary and practically as on other days of the week except so far as there was difficulty in obtaining men to irrigate, and limited somewhat by claims of certain kuleana holders in Sunday day water. * * * Such Sunday irrigation has not been constant but has covered as many as half the Sundays of the year, and more if necessary. * * * Sunday water not needed for irrigation has been steadily used by the Wailuku Sugar Company to fill its reservoirs in Wailuku and Waikapu for later distribution. * * * Land irrigated by such Sunday water might be on an average 500 acres (young cane)". The

commissioner so finds and his finding is amply supported by the evidence. All of such use on Sundays has been in excess of the respondent's rights. It will be noted by reference to what has been stated above that it has exceeded even the use claimed in the *Lonoaea* case.

As found by the commissioner, this finding also being supported by the evidence, the respondent has, since the former judgment, used, "the night water (from 4 p. m. to 4 a. m.) from the Maniania, Kalani and Kama auwais by running the same into one or more of its reservoirs in Wailuku and Waikapu under the following conditions: freely and at its own discretion in times of abundance of surplus water; in a limited way at other times under claim of a right to a portion thereof by virtue of certain taro lands owned, the amount so taken being dependent on the judgment of the plantation water overseers or lunas and on the alertness and vigor of other claimants in asserting their claims". In other words, the respondent has exceeded its night right, which consists merely of the right appurtenant to the taro lands or some of them purchased since 1894.

While it is impossible to ascertain from the evidence, partly because of the reservoir system and of the mingling of Wailuku and Waikapu waters in the ditches and reservoirs, just how much surplus water (as in the opinion defined) has been taken by day by the respondent, we are satisfied from the evidence that some surplus water has been so taken.

The diversion to Waikapu has not been specifically referred to because that issue is in the main disposed of by the above views as to Maniania ditch from which the greater part of the diversion to Waikapu has been made. What has been said as to diversions by Maniania for the watering of new Wailuku lands applies equally to similar diversions for the watering of Waikapu lands. In consequence of the mingling of Waikapu and Wailuku waters, the respondent has failed to show to our satisfaction that the diversions thus far made have been without injury to the rights of others. This inability to prove the harm-

lessness of any given diversion will probably continue as long as the present system of mixing waters continues.

The respondent has based a large part of its argument in justification of its various diversions of water, upon mathematical calculations intended to show that it has planted no greater areas than it has a right to plant. In part these calculations are upon the assumption that the respondent may lawfully use more than sufficient water for the total of 984 acres of "its present estate" under the *Lonoaea* decision in addition to the water to which it has acquired rights since that decision and to that extent, the assumption being found to be erroneous, are of no assistance. Some of the calculations given might indeed, at first impression, lead one to believe that the respondent has not since 1894 watered more land than it is entitled to water and that it has not exceeded its rights. A great weakness of the showing made by these figures lies in the fact that the area of land is not the only standard named in the former judgment for measuring the respondent's rights. The limitations as to auwais, dams, days and hours are none the less to be observed. Apparently contradictory results are reached from various calculations of areas of old and new lands planted and old lands lying fallow, capacity and flow of auwais and stream, the relative necessities of cane and taro, etc. How far these inconsistencies, real or apparent, result from inexact evidence it is, of course, impossible to say. To some extent they are doubtless the result of insufficient evidence, as, for example, on the subject of the quantity diverted to Waikapu and of the areas watered thereby, this whole subject being as yet in a conjectural state, and to some extent the result of the methods employed by the respondent, as, for example, in running in the same auwais and to the same reservoirs Waikapu and Wailuku waters, thus rendering well nigh impossible an exact measurement of past diversions. This method of dealing with the issues involved is at best an unsatisfactory one. It is unnecessary to resort to it, for no mathematical calculations can successfully overcome the other evidence concerning the diversions of Sunday, night and other surplus water

or the fact of the other injury above stated caused by the taking at Maniania. A number of the questions at issue between the parties concerning surplus water and the interpretation of the former judgment being now determined, and the respondent's present rights being now declared, and the fact found that since 1894 it has exceeded those rights in the respects, at least, already stated, it will be sufficient, without definitely determining whether it has in other respects also exceeded its rights, to issue an injunction restraining the respondent from continuing to commit any acts in excess of its rights, first stating in a preamble to the injunction what those rights are, as here ascertained and declared.

The respondent was, at the date of the institution of this suit entitled: (a) to the water, whether of the ordinary flow of the Wailuku stream or of freshet water, needed for the estate, in cane, of 984 acres which it had at the time of the *Lonoaea* judgment, (less deduction for day rights, if any, since lost as above suggested, the extent thereof to remain open to adjudication) such water to be taken from the Kalani and other lower auwais in existence at the date of said judgment on each day of the week, excepting Sunday, from 4 o'clock a. m. to 4 o'clock p. m., the dams to be kept substantiallv as they were at the date of said judgment, composed of loose stones and dirt,—this right of the respondent being subject, however, to the qualification mentioned in the *Lonoaea* decision in favor of E. H. Bailey and others and to the further possible qualification that taro lands held in 1894 and since lost with their water rights have, if it is hereafter so adjudicated, likewise a right to water by day; (b) to take (jointly with the holders of the taro lands) for its taro lands not held in 1894 and acquired by it since the date of said judgment, each day from 4 o'clock p. m. to 4 o'clock a. m. from said auwais, the dams to be kept as stated in (a), the water, whether of the ordinary flow of the Wailuku stream or of freshet water, needed for its said taro lands as such; (c) to the water, whether of the ordinary flow of the Wailuku stream or freshet water, needed for three acres more of taro lands (the right to

which water without the land the defendant has purchased since the date of said judgment), to be taken (jointly with the holders of other taro lands) each day from 4 o'clock p. m. to 4 o'clock a. m. from said auwais, the dams to be kept as stated in (a), provided the water here referred to can be diverted to lands other than said three acres without injury to the rights of others; (d) to divert through the Maniania ditch to new lands water to which it is entitled under (a) above and the use of which is discontinued and as long only as it is discontinued on old lands so under (a) entitled thereto, provided such diversion is accomplished and only to the extent to which it can be accomplished without causing any injury to the rights of others; (e) all of the foregoing rights to be subject to the rule which permits transfers when they may be made without injury to the rights of others. An injunction should be issued restraining the respondent (1) from diverting any water from the Wailuku stream on Sundays between 4 o'clock a. m. and 4 o'clock p. m., (2) from diverting any water from said stream on any day between 4 o'clock p. m. and 4 o'clock a. m., except as stated in (b) and (c) above, (3) from diverting through the Maniania ditch any water from said stream on any day between 4 o'clock p. m. and 4 o'clock a. m., (4) from diverting at any time through the Maniania ditch any water, whether of the ordinary flow or of freshets, without, during the whole of the time of such diversion, diminishing by an equivalent quantity the water which it may rightfully take through the lower auwais, (5) from diverting water through the Maniania ditch by day at such time as to prevent the entire water in the Wailuku stream from being at 4 o'clock p. m. where it would be but for such diversion at Maniania, and (6) from otherwise in any manner exceeding its rights as in this opinion declared. A decree will be made in accordance with these views, on application.

*A. S. Hartwell, W. O. Smith* and *Castle & Withington* for complainant.

*Kinney, McClanahan & Cooper* for respondent.