McBRYDE SUGAR COMPANY, LIMITED,
Plaintiff-Appellant, Cross-Appellee, *v.* AYLMER F.
ROBINSON, et al., Defendants-Appellees,
Cross-Appellants.

No. 4879

JANUARY 10, 1973

RICHARDSON, C.J., MARUMOTO, ABE,
LEVINSON, JJ., AND CIRCUIT JUDGE OGATA
IN PLACE OF KOBAYASHI, J., DISQUALIFIED

OPINION OF THE COURT BY ABE, J.

This is an appeal from the judgment of the Circuit Court of the Fifth Circuit, which determined the water rights of parties who are owners of land situated in the Hanapepe Valley on the Island of Kauai. The trial lasted from May 5 through August 17, 1965. The record of this case includes transcript of testimony of witnesses comprising 3,483 pages and voluminous documentary exhibits.

In arriving at its decision, the trial court first determined the number of acres of land owned by the respective parties, which had been under taro cultivation at the time of the Land Commission Award from time immemorial, and thus entitled to appurtenant water rights. Next, the court determined the average quantity of water used per day per acre in growing taro, which it termed

"duty water" to be 50,050 gallons. After the determination of these two factors, the court found that McBryde was entitled to 4,915,400 gallons per day; the State, 4,167,650 gallons; Gay & Robinson (below Koula and Manuahi) 1,533,050; and the other landowners, collectively, 1,456,950.

The trial court also concluded that McBryde by adverse use had acquired prescriptive rights to 2,084,600 gallons, and thereby McBryde could divert seven million gallons of water per day (4,915,400 appurtenant and 2,084,600 prescriptive). Inasmuch as the prescriptive right could not be deemed against the government, the court held that the amount of prescriptive right to water should be deducted from or charged against the water rights of Gay & Robinson.

The record shows that both McBryde and Gay & Robinson are diverting water from the Hanapepe River basin, so much so that the mouth of the Hanapepe River is practically dry throughout the year. Accordingly judgment was entered ordering Gay & Robinson to leave 12,624,600 gallons of water per day in the river for the use of the other owners, as above indicated.

The three principal parties, McBryde, Gay & Robinson, and the State appealed from the judgment each urging different points on appeal.

## I. APPLICATION OF TERRITORY v. GAY.

The first basic issue before us is whether the trial court was correct in adopting the opinion of Chief Justice Perry in *Terr.* v. *Gay,* 31 Haw. 376 (1930). Gay & Robinson urges that the decision of that case is res judicata as between the State and Gay & Robinson.

The rule of that case is that Gay & Robinson was the owner of the independent ilis[1] or ilis kupono of Koula

---

[1] An *ili* has been interpreted to mean a "land section, next in importance to ahupuaa and usually a subdivision of an ahupuaa." Pukui & Elbert, *Hawaiian Dictionary* at 91 (1971). See also Jon Chinen, *Original Land Titles in Hawaii* at 51 (1961).

and Manuahi; that under ancient law konohikis[2] of ilis kupono were independent of the konohiki of the ahupuaa[3] and paid no tribute to him; though he was subservient and paid tribute directly to the King, and that as owner of such ilis kupono, Gay & Robinson was owner of the normal surplus water.

Under the doctrine of res judicata "an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of rights, questions, and facts in issue, as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *Glover* v. *Fong*, 42 Haw. 560, 573 (1958).

This doctrine is recognized as a general principle formulated by the judiciary based on the obvious and practical role of reason and necessity to promote justice, fairness, expediency, and social and economic stability in our society. In other words, "[t]his general rule is demanded by the very object for which civil courts have been established, which is to secure the peace and repose of society by the settlement of matters capable of judicial determination." *Glover* v. *Fong, supra* at 574, quoting *Southern Pacific Railroad Co.* v. *United States,* 168 U.S. 1, 49 (1897).

Some courts have held that inasmuch as the doctrine of res judicata is adhered to by the courts as a rule of justice, it should not be applied so rigidly if to do so will be to defeat the ends of justice or to work an injustice. *Greenfield* v. *Mather,* 32 Cal. 2d 23, 194 P.2d 1 (1948); *Universal Const. Co.* v. *City of Fort Lauderdale,* 68 So. 2d 366 (1953); *People* v. *Somerville,* 245 N.E.2d 461, 42 Ill. 2d 1 (1969); *Motor Vehicle Accident Indemnification Corp.* v. *National Grange Mutual Ins. Co.,* 19 N.Y.2d 115, 278 N.Y.S.2d 367 (1967).

[2]*Konohiki* means "a head man of an ahupuaa land division" *id.* at 153, see also Chinen at 53.

[3]*Ahupuaa* means "a land division usually extending from the uplands to the sea . . ." *id.* at 8, see also Chinen at 48.

In spite of such rule enunciated by other courts, we are reluctant to treat the doctrine of res judicata as inapplicable in this case as between the State and Gay & Robinson, even though justice may be subserved. Therefore, we hold that the rule of *Terr.* v. *Gay,* 31 Haw. 376, is binding on the State in this case.

However, as between McBryde and Gay & Robinson, and McBryde and the State, we are not faced with the doctrine of res judicata, and as between these parties, the question is whether we will follow the rule of *Terr.* v *Gay,* 31 Haw. 376, under the doctrine of stare decisis.

We fully discussed and differentiated between these two doctrines in *Glover* v. *Fong,* 42 Haw. at 575 as follows:

"The doctrine of res judicata is concerned with the adjudication of a cause of action or an issue and the effect of such adjudication in a subsequent action between parties to the record involving the same cause of action or issue. The doctrine of stare decisis relates to the legal principle that may be extracted from an adjudication of a cause of action or an issue and the application of such principle in a subsequent action between strangers to the record involving similar cause of action or issue. * * * When we say parties to the record, we mean persons who were parties in the action in which the adjudication was made; when we say strangers to the record, we mean persons who were not parties in such action.

There is no element of estoppel in the doctrine of stare decisis because it applies only in actions between strangers to the record. If there is a contention in an action between strangers to the record that a principle for which a prior decision stands is erroneous, operates unjustly or against public interest, or is otherwise objectionable, and such contention is well taken, the court which rendered the decision may overrule it. * * * When a decision is overruled, it

does not mean that the adjudication of the rights and obligations of the parties to the record is nullified; it only means that the legal principle contained in the decision will not be applied in the determination of a cause of action or issue in an action between strangers to the record." (Citations omitted.)

And as the United States Supreme Court said in *Helvering* v. *Hallock,* 309 U.S. 106, 119 (1940) :

"We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But stare decisis is a principle of policy and not a mechanical formula for adherence to the latest decision * * *."

.*See also Humthlett v. Reeves,* 211 Ga. 210, 85 S.E.2d 25 (1954) .

This court, like the United States Supreme Court, has "rejected a doctrine of disability at self-correction." *Helvering* v. *Hallock, supra* at 121. We believe that the doctrine of stare decisis is subordinate to legal reasons and justice and we should not be unduly hesitant to overrule a former decision when to do so would bring about what is the considered manifest justice.[4] In other, words, there is no necessity or sound legal reason to perpetuate an error under the doctrine of stare decisis. Of course, on the other hand, we should not change a case law just for the sake of a change.

## II. STATE OR SOVEREIGN RIGHTS.

In *Terr.* v. *Gay,* 31 Haw. 376, this court concluded that as Gay & Robinson was the owner of Koula and Manuahi, both deemed ilis kupono, and therefore as such

---

[4]See Yoshizaki v. Hilo Hospital, 50 Haw. 150, 433 P.2d 220 (1967) ; State v. Abellano, 50 Haw. 384, 441 P.2d 333 (1968) .

owner it was also entitled to "normal daily surplus water."

Let us review the three cases which were held in *Terr.* v. *Gay, supra* as controlling on the issue of "normal daily surplus water."

In *Peck* v. *Bailey,* 8 Haw. 658, 671 (1867), this court said:

> "While the King owned this Ahupuaa, he had a right to apply the water to what land he pleased, but after the water courses were made, more especially after being in use from time immemorial, his conveyance of the land would include them, the same as his conveyance of land bordering on the Wailuku river will include the rights of water in said river, which had not been before granted."

However, the syllabus or headnote reads: "The owner of an Ahupuaa may apply the water belonging to it to what land he pleases," and this has been held the rule of the case.

Even assuming that it is the rule of the case, it is dictum because the controversy was among grantees of the original konohiki from whom each of them had acquired title to portions of the land in the ahupuaa of Wailuku.

It is stated in *Haw. Com. & Sugar Co.* v. *Wailuku Sugar Co.,* 15 Haw. 675, 680 (1904), that under ancient law "the King was the sole owner of the water as he was the rest of the land and could do with either or both as he pleased. In later years, the rule seems to have been for him not to dispossess tenants of their lands except for cause and to that extent, perhaps, he would not have deprived cultivators of the water to which their lands were by usage entitled. But no limitation, as far as we can learn, ever existed or was supposed to exist to his power to use the surplus waters as he saw fit." We believe the statement correctly states the law under ancient Hawaiian law.

Based on this premise, the *Haw. Com. & Sugar Co.* case concluded that surplus water was the property of the konohiki or chief to whom an ahupuaa had been maheled[5] and he could do with it as he pleased. This also was dictum as the controversy involved in the case was between owners of portions of an ahupuaa and did not involve the rights of konohiki against rights of others with lesser water interest.

In *Carter* v. *Territory*, 24 Haw. 47, 70 (1917), this court said "[w]here a stream flows through a single *ahupuaa* it has been decided that as between the *ahupuaa* and *kuleanas*[6] therein, or portions of the *ahupuaa* conveyed without rights to surplus water, the surplus waters of the stream belong to the *ahupuaa*."

On the issue as to the rights of parties in the surplus waters of a stream which flows from one ahupuaa into another, this court applied the principle of riparian rights and said "each *ahupuaa* is entitled to a reasonable use of such water, first, for domestic use upon the upper *ahupuaa*, then for the like use upon the lower *ahupuaa*, and, lastly, for artificial purposes upon each *ahupuaa*, the upper having the right to use the surplus flow without diminishing it to such an extent as to deprive the lower of its just proportion under existing circumstances." *Carter* v. *Territory, supra* at 70. Of course in that case the only issue related to storm and freshet water claimed by the plaintiff as against the state. However, it is too restrictive to say that the rule was only to be applicable to storm and freshet water and would not be applicable to normal surplus water.

This court in *Terr.* v. *Gay, supra*, reasoned that as

---

[5] The term *mahele* means to divide or apportion. Pukui & Elbert, *Hawaiian Dictionary* at 202. See also Chinen, *Original Land Titles in Hawaii* at 55. When used in the context of land titles, reference is usually to the Great Mahele of 1848, which accomplished the division of the undivided interest in land between the King on one hand and the chief and konohikis on the other. Chinen at 7; Wells H. Hutchins, *The Hawaiian System of Water Rights* at 23 (1946), see page 10, infra.

[6] *Kuleanas* are small parcels of land within an ahupuaa. Pukui & Elbert at 165; Chinen at 54.

the three cases aforementioned had held generally that konohikis of ahupuaa were entitled to surplus water, therefore, a konohiki of an ili kupono, which ili was independent of the ahupuaa and owed no tribute to the konohiki of the ahupuaa was likewise entitled to normal daily surplus water. In reaching this conclusion it stated that a konohiki of an ili of an ahupuaa which was a mere part of or a subdivision of the ahupuaa, owed tribute to the konohiki of the ahupuaa. On the other hand, a konohiki of an ili kupono, which was independent of the ahupuaa, owed no tribute to the konohiki of the ahupuaa, but "was subservient directly to the king." (p. 381) However, even assuming these factors, under the reasoning in *Terr.* v. *Gay, supra,* both the konohikis of the ilis of Manuahi and Koula would be subservient to the konohiki of the ahupuaa of Hanapepe, he being the King himself, the ahupuaa of Hanapepe having been retained by the King as Crown land. Thus, it would not follow that the ilis of Manuahi and Koula were independent of the ahupuaa of Hanapepe, which may have been so if the konohiki of the ahupuaa of Hanapepe had not been the King himself.

Also, the ahupuaa of Hanapepe is a very large tract of land abutting or adjoining the Hanapepe River. It would be very foolish to say the least, for the King who retained the ahupuaa of Hanapepe to convey or transfer his rights as King to all surplus water to the konohikis of the ilis "kupono" of Koula and Manuahi. Thus, in the absence of such expressed intent, it should not be deemed that the King by the mahele transferred his right to the surplus water, and therefore it should be held that the mahele of Koula and Manuahi and the subsequent Land Commission Award and issuance of Royal Patent did not transfer the King's right to surplus water.

Further, the finding that the ili of Koula was an ili kupono is not substantiated by the record. The mahele record shows that one half of Koula was maheled to

Paniani and one half of Koula was retained by the King on February 1, 1848. Subsequently by Act of June 7, 1848, one half of Koula was designated as public land, a change from Crown land. It is clear to us that the designation of "½ of Koula ili no Hanapepe"[7] shows that at least one half of Koula was not intended to be an ili kupono and therefore independent of the ahupuaa of Hanapepe, but a part of or a subdivision of Hanapepe. Thus, when one half of Koula was conveyed by the Hawaiian government on May 30, 1853 by Royal Patent Grant 1108, such conveyance of an ili of Hanapepe should not have made the whole of Koula an ili kupono, even assuming one half of Koula had been maheled to Paniani as an ili kupono. Thus, the State would be entitled to one half or so much of the surplus of the Koula Stream, as owner of the ahupuaa of Hanapepe, of which one half of Koula was a part.

More importantly, can it be said that because the King was the sole owner of all the land in the Hawaiian Kingdom and also sole owner of the water, which is considered part of the land, and because he could do whatever he wanted with surplus water, when he conveyed parcels of land to konohikis, such right of the King to surplus water became the property of konohikis as intimated in the dicta of this court in *Peck* v. *Bailey,* 8 Haw. 658 (1867), and *Haw. Com. & Sugar Co.* v. *Wailuku Sugar Co.,* 15 Haw. 675, 680 (1904)? To answer this question it is required that we review the Great Mahele and the laws which implemented the mahele.

By the mahele or Great Mahele,[8] Kamehameha III in

---

[7]Act of June 7, 1848, L. 1848, p. 22; C.C. p. 374 RLH 1925, Volume II, Appendix, p. 2152, 2174, Koula is designated to wit: "½ of Koula, ili no Hanapepe" (meaning ½ of Koula, ili of the ahupuaa of Hanapepe).

[8]Prior to the mahele the King permitted chiefs, etc., to use certain parcels of his land. "In 1839, a course of lectures on the science of government was delivered by the Rev. William Richards to the chiefs at their request and in the same year [June 7, 1839] the Declaration of Rights, aptly called Hawaii's *Magna Carta* was adopted securing all rights of person and property." Frear, J. *The Evolution of the Hawaiian Judiciary,* pp. 5, 8 (1894).

1848 proclaimed that he was sharing the lands in the Hawaiian Kingdom with his people. It is generally recognized that the mahele did not transfer title to parcels of land which had been maheled. The Land Commission Act[9] has implemented the mahele. This Act created the Board of Land Commission, often called the Land Commission, to quiet land titles and it defines the authority and function of the Land Commission. The object of the law was to have the commission make "investigation and final ascertainment or rejection of all claims of private individuals, whether natives or foreigners, to any landed property acquired" in the Hawaiian Kingdom. The awards of the commission were to be deemed final and binding upon all parties unless appealed.

To carry out its duties the Land Commission on August 20, 1846, adopted principles to be followed by it in quieting title to land. Both the Nobles and Representatives in the Legislative Council on October 26, 1846[10] approved the principles by resolution. The resolution also provided that "all claims for landed property * * * shall be tested by those principles, and according to them be confirmed or rejected."

As indicated in these acts, the object and duty of the Land Commission was either to confirm or reject claims of individuals to parcels of land in the Hawaiian Kingdom and title to land so confirmed was to be conveyed by Royal Patent issued by the Minister of Interior.[11]

The principles specifically and most emphatically indicated that the Land Commission was only authorized

[9]This law was enacted on December 10, 1845 and became effective on February 7, 1846; Laws 1846, p. 107 and appears in R.L.H. 1925, Vol. II, Apendix, p. 2120. The power of the Land Commission was extended from time to time. L. 1848, p. 46, CC, 1859, p. 402; L. 1853, p. 26, CC. 1959, p. 410; L. 1854, p. 21, CC. 1959, p. 415; L. 1854, p. 25, CC. 1959, p. 416; L. 1892, p. 68.

[10]L. 1847 at 81, RLH 1925 (Appendix, Vol. II) at 2124 ff. The provisions also provided for the confirmation of titles to land under Declaration of Rights, June 7, 1839.

[11]L. 1846 at 107, RLH 1925 (Appendix, Vol. II) at 2120, 2123.

to convey certain of the King's rights in land which had been bestowed upon individuals by him, to wit:

> "[H]is private or feudatory right as an individual participant in the ownership, not his sovereign prerogatives as head of the nation. Among these prerogatives which affect lands are the following:

> \*    \*    \*    \*

> "3rd. To encourage and even to enforce the usufruct of lands for the common good * * *."

> \*    \*    \*    \*

> "These prerogatives, power and duties, his Majesty ought not, and ergo, he cannot surrender. Hence the following confirmations of the board and titles consequent upon them must be understood subject to these conditions." L. 1847, 85; RLH 1925, Vol. II, p. 2124, 2128.

We believe that the right to water is one of the most important usufruct of lands, and it appears clear to us that by the foregoing limitation the right to water was specifically and definitely reserved for the people of Hawaii for their common good in all of the land grants.[12]

Thus by the Mahele and subsequent Land Commission Award and issuance of Royal Patent right to water was not intended to be, could not be, and was not trans-

---

[12]It should be noted here that the leaders of the Hawaiian Kingdom were cognizant of the common law rule at the time of the enactment of the principles adopted by the Land Commission in 1845. This is indicated in the first case of Wood v. Stark reported in the Hawaiian Reports, 1 Haw. 9 (1847), wherein it also mentioned Blackstone and Kent commentaries.

Also, in Blackstone, De Luxe Edition, it is stated at 732:

"Land.—Corporeal hereditaments consist wholly of substantial and permanent objects; all which may be comprehendeth in its legal signification any ground, soil, or earth whatsoever; as arable meadows, pastures, woods, moors, waters, marshes, furzes, and heath."

3 Kent's Comm. 401 "corporeal hereditaments are confined to land, which according to Lord Coke includes not only the ground or soil, but everything which is attached to the earth, whether by the course of nature, as trees, herbage, and water, or by the hand of man, as houses and other buildings."

ferred to the awardee, and the ownership of water in natural watercourses, streams and rivers remained in the people of Hawaii for their common good. Therefore, we hold that as between the State and McBryde, and between McBryde and Gay & Robinson, the State is the owner of the water in the Koula Stream and Hanapepe River.

It appears that this Act was very similar to the English common law rules which had evolved by that time, that no one may acquire property to running water in a natural watercourse; *that flowing water was publici juris;* and that it was common property to be used by all who had a right of access to it, as usufruct of the watercourse.[13] *See Mason* v. *Hill,* 5 Barn. & Adol., 110 Eng. Rep. 692 (1833).

## III. APPURTENANT RIGHTS.

The foregoing holding does not mean that McBryde and Gay & Robinson are not entitled to the use of water

---

[13]In *Wood* v. *Waud,* 3 Exc. 748, 154 Eng. Rep. 1047, 1058 (1849), the English court stated:

"Flowing water, as well as light and air, are, in one sense, 'publici juris.' They are a boon from Providence to all, and differ only in their mode of enjoyment. Light and air are diffused in all directions, flowing water in some. When property was established, each one had the right to enjoy the light and air diffused over, and the water flowing through, the portion of soil belonging to him; the property in the water itself was not in the proprietor of the land through which it passes, but only the use of it, as it passes along, for the enjoyment of his property, and as incidental to it.

The law is laid down by Chancellor Kent, in 3 Com. 439, thus: 'Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water. . . . He has no property in the water itself, but a simple usufruct as it passes along.' 'Aqua currit, et debet currere,' is the language of the law; and Mr. Justice Story in *Tyler* v. *Wilkinson* (4 Mason U.S.R. 397), cited in Gale and Whatley on Easements, p. 131, lays down the same law."

Also, in *Embrey* v. *Owen,* 6 Exc. 353, 155 Eng. Rep. 579, 585 (1851), the English court held that:

"[F]lowing water is publici juris, not in the sense that it is a bonum vacans, to which the first occupant may acquire an exclusive right, but that it is public and common in this sense only, that all may reasonably use it who have a right of access to it, that none can have any property in the water itself, except in the particular portion which he may choose

in the Koula Stream and Hanapepe River. It is the general law of this jurisdiction that when land allotted by the Mahele was confirmed to the awardee by the Land Commission and/or when Royal Patent was issued based on such award, such conveyance of the parcel of land carried with it the appurtenant right to water for taro growing. *Peck* v. *Bailey,* 8 Haw. 658, 661 (1867); *Wailuku Sugar Co.* v. *Widemann,* 6 Haw. 185 (1876); *Haw. Com. & Sugar Co.* v. *Wailuku Sugar Co.,* 15 Haw. 675, 691 (1904). And it would appear that the trial court only determined the appurtenant rights of the various owners of land in the Hanapepe Basin.

In its determination, the trial court found each party's "appurtenant water rights" by calculating the number of acres of land owned by the respective parties which had been under taro cultivation at the time of the Land Commission Award, and by multiplying the number of acres by the average quantity of water used per day per acre in growing taro, which the court found to be 50,050 gallons. Both McBryde and the State argue that the trial court failed to include certain acreage which they claim was in cultivation of taro from "time immemorial" at the time of the Land Commission Awards. They also claim that reduction of taro acreage by one third to account for fallowing was an error. The trial court's determination of the amount of acreage in taro cultivation at the time of the awards was necessarily a complex factual issue and a very difficult task, requiring weighing of conflicting expert testimony.

The trial court's task, sitting as Commissioner of Private Ways and Water Rights,[14] was to determine as precisely as possible the amount of water that was actually being used for taro cultivation at the time of the Land

---

to abstract from the stream and take into his possession, and that during the time of his possession only: see 5 B. & Ad. 24. But each proprietor of the adjacent land has the right to the usufruct of the stream which flows through it."

[14] See HRS § 664-31 et seq.

Commission Awards. The burden of proof was on the person asserting the right. The fact that in earlier or later times other land was in taro cultivation is irrelevant. And a reduction for fallowing should properly be made when it appears that at the time of the Land Commission Awards water was not being used to cultivate certain acreage.[15] Also, due to the difficulty and complexity of the task it would be reasonable to expect parties not favored by the findings of the trial court to attack such findings.

The Circuit Court sitting as commissioner, pursuant to HRS Ch. 664, Part III, is subject to Hawaii's Rule of Civil Procedure because such proceeding is not excepted under HRCP Rule 81 (a). Here, after a review of the record, we are not convinced that a mistake has been committed. *Peine* v. *Murphy,* 46 Haw. 233, 238, 377 P.2d 708 (1963); *Klein Inc.* v. *Hotel Kaimana,* 51 Haw. 268, 269, 457 P.2d. 210, 211 (1969). Thus, under HRCP Rule 52(a) the finding of the trial court as to appurtenant water rights is not clearly erroneous and therefore it may not be set aside.

Therefore, we affirm the trial court's finding that McBryde is entitled to 4,915,400 gallons of water per day; the State, 4,167,650 gallons per day; and Gay & Robinson, 1,533,050 gallons per day for 30.63 acres of land that it owned below Koula and Manuahi as appurtenant water rights.

The court found that Gay & Robinson was also entitled to appurtenant water rights to 90 acres of land in Koula and Manuahi based on Judge Cristy's statement in Equity 2911, First Circuit Court, appealed and reported as *Terr.* v. *Gay,* 31 Haw. 376 (1930). No such finding was made in that case and it was not necessary

---

[15]It does seem a bit quaint in this age to be determining water rights on the basis of what land happened to be in taro cultivation in 1848. Surely any other system must be more sensible. Nevertheless, this is the law in Hawaii, and we are bound to follow it. We invite the legislature to conduct a thorough re-examination of the area.

to make such a finding because the sole issue was the ownership of the "daily normal surplus waters." As to the claim of appurtenant water rights, Gay & Robinson had the burden of proof, but no evidence was introduced by Gay & Robinson to meet this burden. The failure of Gay & Robinson to meet this burden is also acknowledged in the Findings of Facts and Conclusions of Law (item 64), wherein it is stated:

> "Gay & Robinson is also entitled to appurtenant water rights for 90 acres of land in Koula and Manuahi, *the quantity of which can not be determined in the absence of evidence as to the duty of water.*" (Emphasis added.)

Thus, the finding of the trial court as to appurtenant water rights of 90 acres of land in Koula and Manuahi is reversed and set aside.

There is no question that appurtenant water right to taro land attached to the land when title was confirmed by the Land Commission Award and title conveyed by the issuance of Royal Patent. However, it does not follow that because McBryde is entitled to 4,915,400 gallons and Gay & Robinson to 1,533,050 gallons as appurtenant water rights to parcels of land owned by each of them in the Hanapepe Valley, they may therefore divert and transport that amount of water without the Hanapepe Valley to be used on other parcels of land owned by them elsewhere. As the use of the word "appurtenant"[16] indicates, it is water rights which pertain to or annexed to that particular parcel of land conveyed by the original

---

[16]Webster's Third New International Dictionary: "appurtenant 1 a: annexed or belonging legally to some more important thing (a right-of-way to land or building); b. Incident to and passing in possession with real estate—used of certain profits or easements . . ."

Black's Law Dictionary, Revised Fourth Edition: "Appurtenant. Belonging to; accessory or incident to; adjunct, appended, or annexed to."

Words & Phrases—"Appurtenances as used with reference to conveyance of realty, means and includes all rights and interest in other property necessary for the full enjoyment of the property conveyed."

grant from the King or Hawaiian government. *Peck* v *Bailey*, 8 Haw. 658, 661 (1867) ; *Wailuku Sugar Co.* v. *Widemann*, 6 Haw. 185 (1876) ; *Haw. Com. & Sugar Co.* v. *Wailuku Sugar Co.*, 15 Haw. 675, 691 (1904) .

We hold that the right to the use of water acquired as appurtenant rights may only be used in connection with that particular parcel of land to which the right is appurtenant and any contrary indications in our case law are overruled. Thus, neither McBryde nor Gay & Robinson may transport water to another watershed, which they may have the right to use under their respective appurtenant water rights.

## IV. RIPARIAN RIGHTS.

McBryde, the State, and Gay & Robinson, as owners of land in the Hanapepe Valley, may have water rights other than appurtenant water rights. This court in *Terr.* v. *Gay*, 31 Haw. 376, 395 (1930) , recognized such a right and said:

> "Water for domestic purposes on a lower ahupuaa is in any event assured under Hawaiian law. Every portion of land, large or small, ahupuaa, ili or kuleana, upon which people dwelt was, under the ancient Hawaiian system whose retention should, in my opinion, continue unqualifiedly, entitled to drinking water for its human occupants and for their animals and was entitled to water for other domestic purposes. At no time in Hawaii's judicial history has this been denied."

This court recognized and included this right to water for domestic purposes as part of the ancient appurtenant rights.

Now, what is this Hawaiian law or ancient Hawaiian system mentioned in the decision? This acknowledgment of the right to domestic water, we believe, was a recognition of the right guaranteed in "Enactment of

Further Principles," enacted by the Hawaiian Government on August 6, 1850, Laws 1850, p. 202,[17] the pertinent portion of which provides:

> "The people [meaning owners of land] also shall have a right to drinking water, and running water, and the right of way. The springs of water, and running water, and roads shall be free to all, should they need them, on all lands granted in fee simple: Provided, that this shall not be applicable to wells and water courses which individuals have made for their own use."

Section 577 of RLH 1925, the effective statute then, contained the provision guaranteeing the right "to drinking water and to running water." It is crystal clear that the statute reserves to land owners the right to both "drinking water" and "running water." Now, what is the right to "running water" guaranteed landowners? As the right to "drinking water and running water" in artificial watercourses constructed by individuals for their own use is excepted by the statute, the term "running water" must mean water flowing in natural watercourses, such as streams and rivers. We also believe that the right to "running water" as contained therein guarantees a land owner the same flow of water in a stream or river as at the time of the mahele, without substantial diminution, or the right to flow of a stream in the form and size

---

[17]The entire Act appears in RLH 1925 (Appendix, Vol. II) at 2141, 2142. A portion of this statute has been on our books since its original enactment and now appears as HRS § 7-1 and reads:

"Building materials, water, etc.; landlords' titles subject to tenants' use. Where the landlords have obtained, or may hereafter obtain, allodial titles to their lands, the people on each of their lands shall not be deprived of the right to take firewood, house-timber, aho cord, thatch, or ki leaf, from the land on which they live, for their own private use, but they shall not have a right to take such articles to sell for profit. The people shall also have a right to drinking water, and running water, and the right of way. The springs of water, running water, and roads shall be free to all, on all lands granted in fee simple; provided, that this shall not be applicable to wells and watercourses, which individuals have made for their own use."

given it by nature. This right may be in connection with his right of laundering, canoeing, swimming, bathing, etc.

We shall next consider the possible reason for the enactment of the law. We are aware that the missionaries, many of whom came from Massachusetts, not only brought the Christian religion to the Hawaiian people, but also brought with them the English common law as recognized in Massachusetts. Also, history shows that missionaries had tremendous influence among the leaders of the Hawaiian Kingdom.[18]

In *Weston* v. *Alden*, 8 Mass. 136 (1811) the Massachusetts Supreme Court recognized the right of an owner of a parcel of land adjoining a brook to use water from such brook for domestic use, including the watering of animals and irrigation of his land. Then, in *Colburn* v. *Richards*, 13 Mass. 420, 421 (1816), the Massachusetts court held that an owner of a parcel of land adjoining a natural watercourse had the right to use the water to irrigate his farm; however, it also held that he could not divert such water from the natural channel to the detriment of an owner of land below. In *Anthony* v. *Lapham*, 22 Mass. 175, 177 (1827), the Massachusetts court said "[e]very man, through whose land water passes, may use it for watering his cattle or irrigating his land, but he must use it in this latter way so as to do the least possible injury to his neighbor who has the same right." It is interesting to note that on this point the court as footnote 1 refers to 3 Kent's Commentaries (13th ed.) 439, 444.

In 3 Kent's Commentaries (13th ed.) 439, it is stated:

> "Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run (*currere solebat*), without

[18]See footnote 8.

diminution or alteration. No proprietor has a right to use the water, to the prejudice of other proprietors, above or below him, unless he has a right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit et debt currere ut currere solebat* is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it, or give it another direction, and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors, he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above * * *."

In *Tyler* v. *Wilkinson*, 4 Mason 397, 400 (1827), in a case involving water rights of the Pawtucket River, which forms a boundary between the States of Massachusetts and Rhode Island, Justice Story stated:

"*Prima facie* every proprietor upon each bank of a river is entitled to the land, covered with water, in front of his bank, to the middle thread of the stream, or, as it is commonly expressed *usque filum aquae*. In virtue of this ownership he has a right to the use of the water flowing over it in its natural current, without diminution or obstruction. But, strictly speaking, he has no property in the water itself; but a simple use of it, while it passes along. The consequence of this principle is, that no proprietor has a right to use the water to the prejudice of another. It is wholly immaterial, whether the party be a proprietor above or below, in the course of the river; the right being common to all the proprietors on the river, no one has a right to diminish the quantity which will, according to the natural current,

flow to a proprietor below, or to throw it back upon a proprietor above. . . . The natural stream, existing by the bounty of Providence for the benefit of the land through which it flows, is an incident annexed, by operation of law, to the land itself. When I speak of this common right, I do not mean to be understood, as holding the doctrine, that there can be no diminution whatsoever, and no obstruction or impediment whatsoever, by a riparian proprietor, in the use of the water as it flows . . . . There may be a diminution in quantity, or a retardation or acceleration of the natural current indispensable for the general and valuable use of the water, perfectly consistent with the existence of the common right. . . . The maxim is applied, *sic utere tuo, ut non alienum laedas."*

In *Wright* v. *Howard*,[19] 1 Simons & Stuart 190, 203 (1823), the English Chancery Court said:

*"Prima facie,* the proprietor of each bank of a stream is the proprietor of half the land covered by the stream, but there is no property in the water. Every proprietor has an equal right to use the water which flows in the stream; and, consequently, no proprietor can have the right to use the water to the prejudice of any other proprietor. Without the consent of the other proprietors, who may be affected by his operations no proprietor can either diminish the quantity of water, which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above."

*Mason* v. *Hill,* 5 Barn. & Adol, 110 Eng. Rep. 692 (1833), is a case where the issue was whether the defendants by diverting water, for a period of less than twenty years, had acquired right to the water by first appropriation so that the plaintiff who had been denied flow of

---

[19]It is interesting to note the similarity of the courts' holding, 3 Kent Commentaries at 439 and Tyler v. Wilkinson, *supra,* which are all contemporaneous.

water in a natural watercourse which flowed through his field could recover damages. The English court said "2 Blackstone's Commentaries, p. 18 'Water is a moveable wandering thing, and must of necessity continue common by the law of nature; so that I can only have a temporary, transient, usufructuary property therein; wherefore if a body of water runs out of my pond into another man's, I have no right to reclaim it.' " (p. 700) Then it said:

> "From these authorities, it seems that the Roman law considered running water, not as a bonum vacans, in which any one might acquire a property; but as public or common, in this sense only, that all might drink it, or apply it, to the necessary purposes of supporting life; and that no one had any property in the water itself, except in that particular portion, which he might have abstracted from the stream, and of which he had the possession; and during the time of such possession only.
>
> We think that no other interpretation ought to be put upon the passage in Blackstone, and that the dicta of the learned Judges above referred to, in which water is said to be publici juris, are not to be understood in any other than this sense; and it appears to us there is no authority in our law, nor, as far as we know, in the Roman law (which, however, is no authority in ours), that the first occupant (though he may be the proprietor of the land above) has any right by diverting the stream, to deprive the owner of the land below, of the special benefit and advantage of the natural flow of water therein." 110 Eng. Rep. 692 at 701.

In *Embrey* v. *Owen*, 6 Exc. 353, 155 Eng. Rep. 579 585 (1851) the English court said:

> "The right to have the stream to flow in its natural state without diminution or alteration is an incident

to the property in the land through which it passes; but flowing water is publici juris, not in the sense that it is a bonum vacans, to which the first occupant may acquire an exclusive right, but that it is public and common in this sense only, that all may reasonably use it who have a right of access to it, that none can have any property in the water itself, except in the particular portion which he may choose to abstract from the stream and take into his possession, and that during the time of his possession only: see 5 B. & Ad. 24. But each proprietor of the adjacent land has the right to the usufruct of the stream which flows through it."

The court also said that the principle of law was established by *Wright* v. *Howard, supra, Mason* v. *Hill, supra, Wood* v. *Waud, supra,* and cases decided by American courts. It also cites 3 Kent's Commentaries 439-445.[20]

In *Miner v. Gilmour,* XII Moore P.C. 131, 14 Eng. Rep. 861, 870 (1858), a case from Canada involving claims of water rights between owners of property on the opposite banks of a river, the English court in applying the doctrine of riparian rights said "[i]t did not appear that, for the purposes of this case, any material distinction exists between the French and English law."

It would appear that in the light of history and historical background of the Hawaiian Kingdom, the provision of the law enacted in August 6, 1850 which reserves to property owners the "right to drinking water and running water," was a codification or statutory enactment of the doctrine of riparian rights recognized as part of the common law by the English and Massachusetts courts.[21]

We therefore hold that under the statute a proprietor

[20]Then at page 586 it quotes extensively from 3 Kent's Commentaries, 13th ed., at 439, in fact the entire section on Running Water excepting the first paragraph. The quotation which appears there is the same as the text in 3 Kent's Commentaries, 13th ed.

[21]On this point it should be noted that the rule of McNaughten's Case, 10

of land adjoining natural watercourses has riparian water rights. Thus, McBryde, the State, and Gay & Robinson, as owners of parcels of land adjoining the Hanapepe River or Koula Stream have such rights — the right to use water flowing therein without prejudicing the riparian rights of others and the right to the natural flow of the stream without substantial diminution and in the shape and size given it by nature. This right is incapable of measurement into number of gallons per day. Of course, the riparian right appertains only to land adjoining a natural watercourse for its use.

## V. PRESCRIPTIVE RIGHTS

The trial court also found that McBryde was entitled to 2,084,600 gallons of water per day by adverse or prescriptive use. The general law is that one may not claim title to or interest in state-owned property by adverse use. *Re Land Title, State of Hawaii,* 49 Haw. 537, 552, 425 P.2d 83, 92 (1967) ; *In re Title of Kioloku,* 25 Haw. 357, 367 (1920) ; *Terr.* v. *Puahi,* 18 Haw. 649 (1908). Recognizing that prescription could not run against the government, the trial court held that McBryde's prescriptive right to water should be deducted from or charged against the water rights of Gay & Robinson. We believe this was error — if McBryde had been prescribing large amounts of water, the trial court should have ordered McBryde to cease prescribing the State's portion, not impose a double burden on Gay & Robinson by having the amount of water used by McBryde charged against Gay & Robinson. However, the issue is academic now since under our holding that the ownership of water flowing in the Koula Stream and Hanapepe River being in the State, as between McBryde and the State, McBryde acquired no prescriptive right to water.

---

Clark & Fin. 200, 210, 8 Eng. Rep. 718 (1843) , which recognized insanity as a defense in a criminal case, was codified in the Hawaiian Kingdom in 1850. See HRS § 703-4.

## VI. "NORMAL DAILY SURPLUS WATER"

In *Terr.* v. *Gay,* 31 Haw. 376 (1930) it was decided that Gay & Robinson was entitled to "normal daily surplus water."[22] That decision was based upon the assumption that there would be a quantity of water which may be deemed "normal daily surplus water" after the water rights of all the owners of land in the Hanapepe Valley were determined; however, at that time, no determination as to the water rights of any of the owners of parcels of land in the Hanapepe Valley had been made. In a sense, the decision was made in a vacuum. Both the State and McBryde owning land abutting the Hanapepe River are entitled to riparian water rights over and above the appurtenant rights as determined by the trial court, and under the riparian doctrine they are entitled to the amount of flow of water in both the Koula Stream and Hanapepe River as water flowed in the stream and river at the time of the award without substantial diminution. In other words, they are entitled to have the flow of water in the Hanapepe River in the shape and size given it by nature. Thus, there can be no quantity of water which may be deemed "normal daily surplus water," and Gay & Robinson is entitled to nothing under the ruling of that case.

Also, Gay & Robinson may not claim the right to appropriate water adverse to the State's riparian and appurtenant rights because one may not claim interest in or title to State property, or right or interest by adverse use.

## VII. RIGHTS TO "STORM AND FRESHET" WATER

We reiterate our holding under point II that title to water was reserved to the State for the common good

---

[22]This question was the sole issue decided by the trial court and the Hawaii Supreme Court.

when parcels of land were allotted to the awardee under the mahele. Thus "storm and freshet" water is the property of the State and we overrule *Carter* v. *Hawaii,* 24 Haw. 47 (1917).

## VIII. SUMMARY

1. As between the State and McBryde, and McBryde and Gay & Robinson, the State is the owner of the water flowing in the Koula Stream and Hanapepe River. However, the owners of land, having either or both riparian or appurtenant water rights, have the right to the use of the water, but no property in the water itself.

2. The State, McBryde and Gay & Robinson have both appurtenant and riparian rights to water in connection with land within the Hanapepe Valley. However, under claim of such rights, neither McBryde nor Gay & Robinson may transport water to another watershed.

3. Under the doctrine of riparian rights, owners of land adjoining a natural watercourse have the right to a flow of a river or stream in the shape and size given it by nature. Thus, under such right there can be no "normal daily surplus" water.

4. McBryde has no prescriptive right to water, as no one may claim title or interest against property owned by the State.

5. "Storm and freshet" water is the property of the State.

Neither McBryde nor Gay & Robinson has any right to divert water from the Koula Stream and Hanapepe River out of the Hanapepe Valley into other watersheds.

Affirmed in part; reversed in part.

*J. Russell Cades* and *Robert B. Bunn* (*Cades Cox Schutte Fleming & Wright* of counsel) for plaintiff-appellant, cross-appellee.

*J. Garner Anthony* and *John H. R. Plews* (*Anthony*

*& Waddoups* of counsel) for defendants-appellees, cross-appellants.

*Andrew S. O. Lee,* Deputy Attorney General (*Bert Kanbara,* Attorney General, with him on the briefs), for State of Hawaii, defendant-appellee, cross-appellant.

---

DISSENTING AND CONCURRING OPINION OF MARUMOTO, J.

I dissent from the decision set forth in the last paragraph of the foregoing opinion of the court that neither Gay & Robinson nor McBryde has any right to divert the water flowing in Koula Stream and Hanapepe River to watersheds beyond the Hanapepe valley.

That decision has no relation whatsoever to the judgment appealed from in this case, and is neither within the issues raised and tried in the circuit court nor within the questions presented and argued to this court.

In the following statement of my view of the case, I will refer to the opinion of the court in this case as the majority opinion; the majority of the justices sitting in the case as the majority; the discussion of my view as the dissent, although it contains my concurrence with the majority on some matters; Gay & Robinson as G&R; and the numbered subparagraphs of Paragraph VIII of the majority opinion as items 1, 2, 3, 4, and 5.

There are two cases in the Hawaii Reports which are related to this case. They are *Territory* v. *Gay,* 25 Haw. 651 (1920), 26 Haw. 382 (1922); and *Territory* v. *Gay,* 31 Haw. 376 (1930), 52 F.2d 356 (9th Cir. 1931), *cert. denied* 284 U.S. 677 (1931). I will refer to the earlier case as *Gay* I, and the later case as *Gay* II.

This case is a sequel to *Gay* II, which was, in turn, a sequel to *Gay* I, and represents the final phase of the controversy regarding the rights of various parties to the water originating on the lands of Koula and Manuahi,

which has been in litigation for more than one-half of a century since the filing of *Gay* I.

The principal parties to the controversy at the present time are the State, G&R, and McBryde.

The State stands in the place of the Territory, as the successor in interest of the konohiki of the ahupuaa of Hanapepe, within which the ilis kupono of Koula and Manuahi are located.

G&R is the successor in interest of the konohiki of the ilis kupono of Koula and Manuahi.

McBryde is the owner of the ilis kupono of Eleele and Kuiloa, and certain kuleanas downstream in the Hanapepe valley, which are entitled to take appurtenant water from Hanapepe River.

In *Gay* I, the Territory challenged the ownership by G&R of a major portion of the land of Koula.[1] A decision in favor of the Territory would have placed the challenged portion in the ahupuaa of Hanapepe. The Territory then would have been the owner of the surplus water of that portion of the land under the prior decisions of this court which recognized the surplus water of a stream having its source in an ahupuaa as belonging to the konohiki of the ahupuaa.

This court determined the entire land of Koula to be an ili kupono belonging to G&R. There has never been any challenge to the title of G&R to the ili kupono of Manuahi. Thus, at this date, there can be no question regarding the ownership by G&R of the lands of Koula and Manuahi.

In *Gay* II, the Territory, having lost in *Gay* I, challenged the ownership by G&R of the surplus water of Koula Stream and Manuahi Stream.

The vehicle which the Territory used in the challenge was an equity suit to enjoin G&R from diverting

---

[1]The land of Koula contains 5,520 acres, covered by Grant 1108 and Royal Patent 6998 issued to the predecessors in title of G&R. Grant 1108 covers a portion containing 740 acres in the lower corner. The Territory did not challenge the ownership by G&R of that portion.

the surplus water of the two streams to the arid lands of Makaweli. However, the right of the owner of the water, whether it be the Territory or G&R, to divert it from the watershed of origin to other watersheds was not made an issue in the case. The Territory rested its case solely on the contention that ilis kupono are of a less degree of dignity than an ahupuaa and that the primary right to the water arising in such ilis is in the owner of the ahupuaa in which the ilis are located.

It is obvious that the right of the owner of the water to divert it from the watershed of origin to other watersheds was not raised as an issue in the case for the reason that the existence of such right was deemed to be a closed question under the prior court decisions going back to *Peck* v. *Bailey*, 8 Haw. 658 (1867), followed by *Horner* v. *Kumuliilii*, 10 Haw. 174 (1895), *Wong Leong* v. *Irwin*, 10 Haw. 265 (1896), and the Wailuku River cases litigated in *Lonoaea* v. *Wailuku Sugar Co.*, 9 Haw. 651 (1895), and *Hawaiian Commercial & Sugar Co.* v. *Wailuku Sugar* Co., 14 Haw. 50 (1902), 15 Haw. 675 (1904), 16 Haw. 113 (1904). *Peck* v. *Bailey* sanctioned a diversion of water from one portion of an ahupuaa to another portion of the same ahupuaa; *Horner* v. *Kumuliilii* a diversion from one kuleana to other kuleanas; and *Wong Leong* v. *Irwin* a diversion from one ahupuaa to other ahupuaas.

The circuit court limited its decision to the normal daily surplus water of Koula Stream and Manuahi Stream, finding that there was no attempt by G&R to appropriate the storm and freshet water of the streams, and entered a decree denying the injunction sought by the Territory.

Upon appeal, this court affirmed the decree in a split decision, the dissenting justice being of the view that the doctrine of riparian right was applicable to the case, both with respect to normal surplus water and storm and freshet water.

I do not think that there can be any question that *Gay* II established the following: (1) the ownership by G&R of the normal surplus water of Koula Stream and Manuahi Stream; and (2) the right of G&R to divert such surplus water to areas beyond the Hanapepe valley.

*Gay II* is res judicata only as between the State and G&R. However, no party other than the Territory ever challenged the ownership by G&R of the normal surplus water of the two streams. Nor has any party ever questioned the right of G&R to divert such water from the Hanapepe valley to areas outside of the valley.

It appears that one of the principal reasons, if not the only reason, which caused McBryde to institute the instant proceeding was that, after *Gay* II, G&R began diverting the water deemed to be storm and freshet water, and also some of the water deemed to be appurtenant to the lands downstream in the Hanapepe valley, by making changes in the facilities for the diversion of the water to Makaweli, which increased the carrying capacity of such facilities from 40,000,000 gallons per day to 65,000,000 gallons per day.

The issues in this case, raised and tried in the circuit court, were: (1) the quantity of water of Koula Stream and Manuahi Stream to which McBryde is entitled as appurtenant to its lands in the Hanapepe valley; (2) the quantity of such water to which the State is entitled as appurtenant to its lands in the valley; (3) the quantity of such water to which other owners of lands in the valley are entitled as appurtenant to their lands; (4) the quantity of such water which McBryde is entitled to take under a claim of prescriptive right; and (5) the right of G&R, the State, McBryde, and other owners of lands in the valley to the storm and freshet water of Koula Stream and Manuahi Stream. Those also were the issues, and the only issues, presented and argued to this court on the present appeal.

The circuit court made its determinations on the

first three issues, and also a determination of the quantity of water appurtenant to the lands owned by G&R in the Hanapepe valley. Those determinations are set forth in the majority opinion. The majority holds that they were correctly made. I concur in that holding.

On the fourth issue, the circuit court determined that McBryde has a prescriptive right to take 2,084,600 gallons per day, to be charged against the surplus water which G&R is entitled to retain and divert. The majority holds, in item 4, that McBryde does not have such prescriptive right. I concur in that holding also, but not for the reason given therefor in item 4.

I think that McBryde has no prescriptive right because its taking was not adverse to the right of G&R to the normal surplus water of Koula Stream and Manuahi Stream. McBryde's intake points are below the diversion point of G&R. In the establishment of prescriptive right to water, adverse use does not run upstream. *Wellsville East Field Irrigation Co.* v. *Lindsay Land & Livestock Co.,* 104 Utah 448, 137 P.2d 634 (1943) ; *Day* v. *Hill,* 241 Ore. 507, 406 P. 2d 148 (1965) .

On the fifth and last issue, the circuit court determined that the storm and freshet water of Koula Stream and Manuahi Stream belonged to G&R as part of the surplus water which the owner of the land on which a stream has its source is entitled to appropriate. In item 5, the majority holds that the ownership of storm and freshet water is in the State. I do not concur in that holding; nor do I agree with the determination of the circuit court on the issue.

I would follow *Carter* v. *Territory,* 24 Haw. 47 (1917) , on the matter. In that case, this court divided the surplus water of a stream into normal surplus water and storm and freshet water, and held that the doctrine of riparian right was applicable to the latter.

I think that the holding in *Carter* v. *Territory* on storm and freshet water was proper. The right to storm

and freshet water was an issue in the case. But no showing was made therein regarding any Hawaiian usage on the matter. In the situation, the disposition of the issue was governed by the statutory provision presently compiled in HRS § 1-1, which declares the common law of England, as ascertained by English and American decisions, to be the common law of Hawaii, except as otherwise fixed by Hawaiian judicial precedent or established by Hawaiian usage.

The decision set forth in the last paragraph of the majority opinion involves a consideration of the doctrine of res judicata in its effect upon G&R, and a consideration of the principle of stare decisis insofar as it prevents McBryde from diverting the water appurtenant to its lands in the Hanapepe valley for use upon its lands beyond the valley.

The majority professes to recognize in the body of the majority opinion, albeit reluctantly, that *Gay* II is res judicata between the State and G&R, and holds that it is binding on the State. However, the decision effectively nullifies that holding to the extent that it denies G&R the right to divert the normal surplus water of Koula Stream and Manuahi Stream to Makaweli.

*Greenfield* v. *Mather*, 32 Cal. 2d 23, 194 P.2d 1 (1948), is cited by the majority for the proposition that the doctrine of res judicata "will not be applied so rigidly as to defeat the ends of justice or important considerations of policy."

I think that res judicata is an imperative, which commands adherence without any exception. I agree with Mr. Justice Traynor, who stated in his dissent in *Greenfield* v. *Mather* that "a departure from res judicata throws into question the finality of any judgment and thus is bound to cause infinitely more injustice in the long run than it can conceivably avert in this case"; and with Mr. Justice Edmonds, who stated in his dissent in the same case, as follows: "No doctrine in the law is more funda-

mental and it is vital to the orderly administration of justice. * * * Courts should stand firm against a policy of endless litigation in which nothing is ever decided with certainty."

The principle of stare decisis, which is involved in the portion of the decision which prevents McBryde from diverting the water appurtenant to its lands in the Hanapepe valley for use in other areas does not require strict adherence to prior decisions as in the case of res judicata. Nevertheless, it counsels adherence to precedents, particularly with respect to precedents relating to property rights, on the reasoning that "it is better to adhere to principles once fixed, though, originally, they might not have been perfectly free from all objection, than to unsettle the law, in order to render it more consistent with the dictates of sound reason." Washington, J., *Marine Insurance Co.* v. *Tucker,* 3 Cranch (7 U.S.) 357 (1806).

In deciding that McBryde has no right to divert the water appurtenant to its lands in the Hanapepe valley, the majority deems that the prior court decisions recognizing the right of the owners of water to divert the water from one area to other areas were based upon erroneous legal reasoning, and cites *Helvering* v. *Hallock,* 309, U.S. 106 (1940), in which the court declined to follow a precedent urged to be applicable.

In *Helvering* v. *Hallock* the court stated that it had "from the beginning rejected a doctrine of disability at self-correction," and, further, that "stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision." However, a careful reading of that case shows that the principle of stare decisis was not followed there because the precedent urged upon the court involved "collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience," and also because the precedent did not contain "rules of decision around

which, by the accretion of time and the response of affairs, substantial interests have established themselves."

I think that in Hawaii, around the prior court decisions sanctioning the diversion of water from one area to other areas, substantial interests have established themselves "by the accretion of time and response of affairs."

The record in this case shows that the water diverted from Koula Stream and Manuahi Stream by G&R is used in irrigating the sugar cane fields of Olokele Sugar Company, Limited, in Makaweli, and that the water diverted from Hanapepe River by McBryde is used in irrigating its sugar cane fields in Lawai and other areas beyond the Hanapepe valley. There is also evidence in the case that, subsequent to the decision in *Gay* II, G&R and Olokele spent approximately $119,000 and $788,800, respectively, on the system for the diversion of the water of Koula Stream and Manuahi Stream to Makaweli, and that McBryde spent $558,000 for pumping equipment in the Hanapepe valley, $226,000 for ditches and siphons to transport the water to its cane fields beyond the valley, and $60,000 for the construction of reservoir to store the water.

Although I do not have specific information at hand, I presume that, besides the parties in this case, there are other segments in the agricultural economy of Hawaii which depend upon irrigation for the cultivation of their crops, have expended substantial sums in constructing irrigation facilities in reliance upon prior court decisions, and will be adversely affected by the decision announced today.

Chief Justice Stone stated in *United States* v. *Southeastern Underwriters Assn.*, 322 U.S. 533, 579 (1944) :

"To give blind adherence to a rule or policy that no decision of this Court is to be overruled would be itself to overrule many decisions of the Court which do not accept that view. But the rule of stare

decisis embodies a wise policy because it is often more important that a rule of law be settled than that it be settled right. * * * The question then is not whether an earlier decision should ever be overruled, but whether a particular decision ought to be. And before overruling a precedent in any case it is the duty of the Court to make certain that more harm will not be done in rejecting than in retaining a rule of even dubious validity."

That statement was made in a dissenting opinion. However, I think that, in a case such as this, it provides a proper guide to follow.