**Electronically Filed**
**Intermediate Court of Appeals**
**30006**
**13-JUN-2013**
**11:26 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


In the Matter of the Application of
THE TRUSTEES UNDER THE WILL AND OF THE
ESTATE OF JAMES CAMPBELL, DECEASED,
to register and confirm title to land
situated at Kahuku, District of Koʻolau Loa,
City and County of Honolulu, State of Hawaiʻi


NO. 30006


APPEAL FROM THE LAND COURT OF THE STATE OF HAWAI'I
(LAND COURT NO. 08-0054, APPLICATION NO. 1095)


JUNE 13, 2013


NAKAMURA, CHIEF JUDGE, FOLEY, J., and
CIRCUIT JUDGE CASTAGNETTI, in place of FUJISE,
LEONARD, REIFURTH and GINOZA, JJ., all recused


OPINION OF THE COURT BY NAKAMURA, C.J.


Petitioners-Appellees James Campbell Company LLC
(Campbell), James C. Reynolds, Inc. (Reynolds), and Continental
Pacific, LLC (Continental) (collectively referred to as
"Petitioners") are the successors in interest to the Trustees
under the Will and of the Estate of James Campbell, Deceased
(Trustees), with respect to the property at issue in this appeal.

Respondent-Appellant State of Hawai'i (State) is the successor in interest to the Territory of Hawai'i (Territory). See Admissions Act of March 18, 1959, Pub. L. No. 86-3 (hereinafter, "Admissions Act"), § 5(a), 73 Stat. 4, reprinted in, Hawaii Revised Statutes (HRS), vol. 1 at § 5(a) of the Admissions Act.[1]

In 1934, the Trustees filed Application No. 1095 with the Land Court of the Territory of Hawai'i[2] to register title to a large area of land located on the North Shore of the Island of O'ahu. A small portion of the land covered by Application No. 1095, which Petitioners describe as approximately 235 acres, is the subject of this appeal (Subject Property). The Territory filed an "Answer and Claim" to the Trustees' application and asserted certain interests in the land sought to be registered. A portion of the Subject Property is derived from Land Commission Awards with Royal Patents and a Royal Patent Grant that contained reservations of mineral or metallic mines in favor of the government. However, in its "Answer and Claim," the Territory did not assert any claim for the reservation of mineral or metallic mines. The Territory also did not assert a claim for a reserved easement for the free flowage of waters.

On November 30, 1937, the Land Court issued its "Decision" on the Trustees' Application No. 1095 (Original Decision), which stated that the claims of the Territory had been settled by agreement with the applicants or by exchange deeds filed in the record. The Original Decision held that the Trustees, subject to the exceptions noted, were the owners in fee simple of the lands described in the application. On January 24, 1938, the Land Court issued its original Decree of registration

_____

[1] In Trustees of the Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 160, 737 P.2d 446, 450, the Hawai'i Supreme Court stated that "[u]nder section 5(a) of the Admission Act, Pub. L. No. 86-3, 73 Stat. 4 (1959), the State and its political subdivisions became the successors in title to the Territory and its political subdivisions in the lands held by the Territory and the counties."

[2] The Land Court of the State of Hawai'i is the successor of the Land Court of the Territory of Hawai'i, see Admissions Act § 12, and we will refer to both at the "Land Court."

(Original Decree), which resulted in the issuance of the Original Certificate of Title No. 17,854 (Original Certificate of Title). The Original Decree and the Original Certificate of Title, which included the Subject Property, did not contain a reservation of mineral or metallic mines or an easement for the free flowage of waters with respect to the Subject Property.

Over seventy years after the issuance of the Original Decree and Original Certificate of Title, Petitioners in 2008 initiated the Land Court proceeding that is the subject of this appeal. In 2009, Petitioners filed an "Amended and Restated Petition for Consolidation and Resubdivision, Creation of Shoreline Setback Line, and Designation of Easements" (Amended Petition) regarding the Subject Property. The State filed an answer to the Amended Petition and claimed various interests, including that (1) "[t]he State owns all mineral and metallic mines of every kind or description on the [Subject Property], including geothermal rights, and the right to remove the same"; and (2) "[t]he State has reserved an easement for the free flowage of any waters through, over, under, and across the [Subject Property.]" The Land Court[3/] rejected the State's claims regarding these two interests and did not include them as encumbrances on the Subject Property. On July 16, 2009, the Land Court filed its "Findings of Fact, Decision and Order (Map 176)" and its "Decree (Map 176)."

On appeal, the State argues that the Land Court erred in denying its claim of ownership of all mineral and metallic mines, including geothermal rights, on the Subject Property and its claim of a reserved easement for the free flowage of waters. As explained below, we hold, under the circumstances of this case, that the Land Court did not err in denying these claims. Accordingly, we affirm the Land Court's "Decision and Order" on the Amended Petition and its "Decree (Map 176)."

---

[3/] The Honorable Gary W.B. Chang presided.

3

BACKGROUND

I.

The Subject Property is derived from four prior land grants:

>    (1) Land Commission Award 8452 Apana 1, dated March 21, 1854, and Royal Patent No. 5616, dated October 15, 1867, both to A. Keohokalole (Royal Patent No. 5616);
>
>    (2) Land Commission Award 7130, dated October 1, 1852, and Royal Patent No. 5693, dated April 19, 1873, both to Kinimaka (Royal Patent No. 5693);
>
>    (3) Royal Patent Grant No. 550 to Charles Gordon Hopkins, dated March 12, 1851 (Grant No. 550); and
>
>    (4) the Deed of King Kamehameha III to Charles Gordon Hopkins, dated September 10, 1851, recorded in the Bureau of Conveyances of the State of Hawai'i in Liber 5, page 153 (Kamehameha III Deed).

Royal Patent No. 5616, Royal Patent No. 5693, and Grant No. 550, were subject to express reservations of mineral or metallic mines in favor of the Hawaiian Government. The Kamehameha III Deed did not contain an express reservation of mineral or metallic mines. None of the four land grants contained a reservation in favor of the government of an easement for the free flowage of waters.

On July 16, 1934, the Trustees filed Application No. 1095 with the Land Court to register title to approximately 15,000 acres of land on the North Shore of O'ahu, of which the Subject Property was a small portion. The Trustees' application was brought pursuant to the then-exiting Land Court Registration Statute (the predecessor of HRS Chapter 501), and the Trustees sought to have their title to the land covered by their application "registered and confirmed as an absolute title." The Territory filed an "Answer and Claim" to the Trustees' application, asserting claims of title to and easements over

certain of the properties covered by the application.[4] The Territory, however, did not claim ownership of any mineral or metallic mines or claim an easement for the free flowage of waters in its "Answer and Claim."

On November 30, 1937, the Land Court issued its Original Decision in Application No. 1095. With respect to the Territory's claims, the Original Decision stated that all claims set forth in the Territory's "Answer and Claim" "have been settled by agreement with the applicants or by exchange deeds filed in the record herein." On January 24, 1938, the Land Court issued its Original Decree regarding Application No. 1095, which resulted in the issuance of the Original Certificate of Title on that same date. The Land Court decreed that the Trustees "are the owners in fee simple" of the land described in the Original Decree,[5] which included the Subject Property, and that the Trustees' title was subject to various encumbrances. The list of encumbrances set forth in the Original Decree and the Original Certificate of Title does not contain a reservation of mineral or metallic mines or a reserved easement for the free flowage of waters in favor of the government. The Territory did not appeal from the Land Court's Original Decision or its Original Decree in Application No. 1095.

II.

On July 2, 2008, Petitioners filed a "Petition for Consolidation and Resubdivision, Creation of Shoreline Setback Line, and Designation of Easements" with respect to the Subject Property. On February 12, 2009, Petitioners filed their Amended Petition. In the Amended Petition, Petitioners asked the Land Court to (1) consolidate Lot 30 and 1198 of the Subject Property; (2) re-subdivide the Subject Property into Lots 1218 and 1219;

_____

[4] None of the various claims of interest asserted by the Territory in their "Answer and Claim" are at issue in this appeal.

[5] It appears that the Original Decree covered and included almost all of the land the Trustees had sought to register in their application.

(3) issue new certificates of title showing Campbell as the sole owner of Lot 1219 and Reynolds and Continental as joint owners of Lot 1218; (4) designate a shoreline setback based on the current shoreline which had been affected by erosion; and (5) recognize certain easements and encumbrances not at issue in this appeal.

The State filed an answer to the Amended Petition on March 11, 2009. In its prayer for relief, the State claimed the following interests in the Subject Property:

> 1. The State owns all mineral and metallic mines of every kind or description on the property, including geothermal rights, and the right to remove the same;
>
> 2. The State owns the submerged land up to the highest reaches of the wash of the waves, including the 34.113 acre eroded area;
>
> 3. The property is subject to the rights of native tenants;
>
> 4. The State has reserved all right, title, interest, or claim to waters having their source upon or flowing over or under the property;
>
> 5. The State has reserved an easement for the free flowage of any waters through, over, under, and across the property;
>
> 6. The State has reserved its interests in all religious, historical, and archeological sites on the property; [and]
>
> 7. The State has reserved any other interest in the property that may be revealed during the course of this proceeding[.]

On July 16, 2009, the Land Court issued its "Findings of Fact, Decision and Order (Map 176)" regarding the Amended Petition. In Finding of Fact (FOF) 24, the Land Court found that the State "owns the submerged lands up to the highest reaches of the wash of the waves, including 34.113 acres of eroded land." In FOF 29, the Land Court found the State "has reserved an interest in the rights of native tenants, if any, that may affect the [Subject Property], but the interest of the State of Hawai'i, if any, is not an easement or encumbrance upon registered title." These findings are not disputed or at issue in this appeal.

With respect to the State's claim that it owns all mineral and metallic mines on the Subject Property, the Land Court made the following FOFs:

> 30. The reservations of mineral and metallic mines in (i) Royal Patent No. 5616 to A. Keohokalole, for the lands in Malaekahana, (ii) Royal Patent No. 5693 to Kinimaka for roughly one half of the lands in Keana, and (iii) Grant No. 550 to Charles Gordon Hopkins for the remaining one half of the lands in Keana were extinguished by issuance of the original decree in Land Court Application No. 1095 in 1938.

> 31. The land in Kahuku conveyed by Deed of Kamehameha III to Charles Gordon Hopkins dated September 10, 1851, recorded in the Bureau of Conveyances of the State of Hawai'i in Liber 5, Page 153, never was subject to a reservation of mineral and metallic mines in favor of any government or person.

With respect to the State's assertion of water rights and a reserved easement for the free flowage of water concerning the Subject Property, the Land Court made the following FOF:

> 28. The State of Hawai'i has asserted, and the Court finds that the State of Hawai'i has reserved an interest in water rights, if any, that may affect the [Subject Property], but the interest of the State of Hawai'i, if any, is not an easement or encumbrance upon registered title.

Based on its FOFs, the Land Court issued a "Decision and Order," which ruled that except for the State's ownership of submerged lands up to the highest reaches of the wash of the waves described in FOF 24, and the reserved rights, if any, regarding water rights and the rights of native tenants described in FOFs 28 and 29, the ownership interests or reservations asserted by the State in Paragraphs 1, 3, 4, 5, 6, and 7 of the State's prayer for relief were denied.[6] The Land Court granted the Amended Petition and ordered the entry of a decree in conformity with its ""Findings of Fact, Decision and Order (Map 176)." The Assistant Registrar of the Land Court complied with this directive by filing the "Decree (Map 176)" on July 16, 2009.

---

[6] In FOF 32, the Land Court found that except for the rights described in FOF 24 and the reserved rights, if any, described in FOFs 28 and 29, the State "has not produced sufficient evidence to support its argument that the State of Hawai'i has the ownership or other reserved interests described in paragraphs 1, 3, 4, 5, 6, and 7 of [its] prayer for relief[.]"

DISCUSSION

On appeal, the State argues that the Land Court erred in denying the State's claim of ownership of all mineral and metallic mines, including geothermal rights, on the Subject Property and its claim of a reserved easement for the free flowage of waters. The State also challenges the Land Court's FOFs which formed the basis for its denial of these claims. For the reasons discussed below, we conclude that the Land Court did not err in denying the State's claims regarding mineral and metallic mines and a reserved easement for the free flowage of waters.

I.

A.

Of the four prior land grants from which the Subject Property is derived, Royal Patent No. 5616, Royal Patent No. 5693, and Grant No. 550 were subject to express reservations of mineral or metallic mines in favor of the Hawaiian Government. The State acknowledges that the fourth land grant, the Kamehameha III Deed, did not expressly reserve the government's ownership of mineral or metallic mines, but argues that this reservation was implicit and "self-effectuating."

The State contends that the Land Court's issuance of the Original Decree and the Original Certificate of Title in 1938 did not extinguish the government's express or implied reservations of mineral and metallic mines on the Subject Property. The State also contends that the government's reservations of mineral and metallic mines includes geothermal rights. We conclude that the Land Court properly denied the State's claim that it owned all mineral and metallic mines on the Subject Property. We hold that the Original Decree and the Original Certificate of Title extinguished the express government reservations of mineral or metallic mines set forth in Royal Patent No. 5616, Royal Patent No. 5693, and Grant No. 550 and also extinguished any implicit reservation in the Kamehameha III Deed.

B.

In this section, we will set forth the pertinent provisions of the Land Court Registration Statute under which the Land Court decided the Trustees' 1934 application for registration and issued the Original Decree and the Original Certificate of Title in 1938. These provision are substantially the same as the current Land Court Registration Statute, HRS Chapter 501, with respect to the issues raised in this appeal. When citing the provisions of the Land Court Registration Statute applicable to the Original Decree and the Original Certificate of Title, we will note the corresponding provisions of HRS Chapter 501.

The following provisions were in effect and applicable to the Land Court's determination of the Trustees' 1934 application for registration:

The Revised Laws of Hawaii (RLH) § 5037 (1935) (predecessor of HRS § 501-71) provided, in relevant part:

> <u>Every decree of registration of absolute title shall bind the land, and quiet the title thereto, subject only to the exceptions stated in [section 5041]</u>.[2] <u>It shall be conclusive upon and against all persons, including the Territory</u>, whether mentioned by name in the application, notice or citation, or included in the general description "to all whom it may concern". The decree shall not be opened by reason of the absence, infancy or other disability of any person affected thereby, nor by any proceeding at law or in equity for reversing judgments or decrees; subject, however, to the right of any person deprived of land or of any estate or interest therein by a decree of registration obtained by fraud to file a petition for review within one year after the entry of the decree; provided no innocent purchaser for value has acquired an interest. If there is any such purchaser the decree of registration shall not be opened but shall remain in full force and effect forever, subject only to the right of appeal hereinbefore provided. But any person aggrieved by the decree in any case may

---

[2] RLH § 5037 refers to "exceptions stated in the following section." However, the "following section," RLH § 5038 (1935), does not refer to exceptions to absolute title, which are instead set forth in RLH § 5041 (1935). The discrepancy was apparently the result of the recodification of the Land Court Registration Statute and the addition and renumbering of sections from the 1925 version to the 1935 version of the RLH. The discrepancy was corrected in the 1945 RLH. <u>See</u> RLH § 12637 (1945).

> pursue his remedy by action of tort against the applicant or any other person for fraud, in procuring the decree.

(Emphasis added; emphasis in original omitted.)

RLH § 5038 (1935) (predecessor of HRS § 501-74) provided, in relevant part:

> Every decree of registration shall bear the date of the year, day, hour and minute of its entry, and shall be signed by the registrar. . . . It shall contain a description of the land as finally determined by the court; and shall set forth the estate of the owner, and also, in such manner as to show their relative priority, all particular estates, mortgages, easements, liens, attachments and other encumbrances, including rights of husband or wife, if any, to which the land or the owner's estate is subject; and may contain any other matter properly to be determined in pursuance of this chapter.

(Emphasis added.)

RLH § 5041 (1935) (predecessor of HRS § 501-82), provides in relevant part:

> Every applicant receiving a certificate of title in pursuance of a decree of registration, and every subsequent purchaser of registered land who takes a certificate of title for value and in good faith, shall hold the same free from all incumbrances except those noted on the certificate, and any of the following incumbrances which may be subsisting . . . . [8/]

(Emphasis added.)

C.

Pursuant to these provisions, the registration of the Subject Property through the Original Decree and the Original Certificate of Title quieted title to the Subject Property in favor of the Trustees and against all persons, including the Territory. RLH § 5037 (predecessor of HRS § 501-71). By virtue of the Land Court registration of the Subject Property, the

---

8/ RLH § 5041 goes on to list several encumbrances, such as certain liens, unpaid taxes, public highways, and short-term leases which are not extinguished by the Land Court's issuance of a certificate of title. Campbell asserts, and the State does not dispute, that the State's claim of a reservation of mineral and metallic mines and an easement for the free flowage of waters are not among the encumbrances mentioned in RLH § 5041 or HRS § 501-82. We note that consistent with RLH § 5041, the Original Decree and the Original Certificate of Title provided that the Trustees' registered title was "subject . . . to any of the encumbrances mentioned in Section 5041 of said Revised Laws of Hawaii 1935" as well as the specific encumbrances listed in the Original Decree and the Original Certificate of Title.

Trustees held, and subsequent good faith purchasers of the Subject Property for value hold, the Subject Property free from all encumbrances, except for encumbrances noted on the certificate of title and encumbrances (not relevant to this appeal) set forth in RLH § 5041 and its successor HRS § 501-82.

In discussing the principles underlying Hawaiʻi's Land Court registration system, the Hawaiʻi Supreme Court has stated that "[t]he fundamental intent of HRS § 501-82 [(successor of RLH § 5041)] is to preserve the integrity of titles." Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership, 75 Haw. 370, 391, 862 P.2d 1048, 1060 (1993). In Honolulu Memorial Park, Inc. v. City and County of Honolulu, 50 Haw. 189, 436 P.2d 207 (1967), the Hawaiʻi Supreme Court rejected the City's contention that it had an equitable right to an easement for a sewer line, where the claimed easement had not been noted as an encumbrance on the certificate of title of property registered under the Land Court Registration Statute. The supreme court reasoned:

> [T]o allow the assertion of unregistered rights, be they legal or equitable, would be to subvert the obvious intent and purpose of the title registration system. The integrity of titles can only be preserved if anyone dealing with registered property is assured that the only rights or claims of which he need take notice are those which are registered in the prescribed manner. If for that reason alone, the provisions of the title registration statute must be allowed to prevail over any contravening doctrine of the common law.

Id. at 193-94, 436 P.2d at 210 (emphasis added).

The supreme court, in order to fulfill the purpose of the Land Court Registration Statute, also held that "a certificate of title is unimpeachable and conclusive except as otherwise provided by law" and that "knowledge of an unregistered encumbrance does not disqualify the holder of a certificate of title from the protection afforded him by the title registration statute." Id. at 192, 436 P.2d at 209-10. The supreme court therefore affirmed the trial court's refusal to admit evidence proffered by the City to show that the appellee and its predecessors in title had knowledge of the unregistered

11

encumbrance, which the City contended supported its claim that the appellee was not entitled to the protection of the Land Court Registration Statute.  Id. at 192, 436 P.2d at 209.  The supreme court explained:

> "If, as we hold, a certificate of title is unimpeachable and conclusive except as otherwise provided by law, it would be illogical to say that it may be impeached if the purchaser for value had knowledge of an existing unregistered encumbrance.  To do so would be to rob a certificate of title of its conclusive and unimpeachable character and place it in the same category as the ordinary record in the bureau of conveyances.  If the intent and purpose of the law pertaining to the registration of land titles is to be preserved, the integrity of certificates of title must be scrupulously observed and every subsequent purchaser of registered land who takes a certificate of title for value, except in cases of fraud to which he is a party, is entitled under the provisions of section 5041 [(predecessor of HRS § 501-82] to hold the same free from all encumbrances except those noted on the certificate and the statutory encumbrances enumerated."

Id. at 192-93, 436 P.2d at 210 (quoting In re Bishop Trust Co., 35 Haw. 816, 825 (Haw. Terr. 1941).

In Waikiki Malia, the Hawaiʻi Supreme Court applied HRS § 501-82 (successor of RLH § 5041)[9/] in holding that a restrictive covenant imposing a building height restriction, which was set forth in a deed previously filed with the Land Court but had not been separately noted as an encumbrance on the transfer certificate of title, had been extinguished.  Waikiki Malia, 75 Haw. at 376-77, 389-92, 862 P.2d at 1054, 1059-61.  The supreme court concluded that despite the current property owner's admitted knowledge of the height restriction, because the restriction was never explicitly and separately noted on the

_____

[9/] The supreme court quoted the relevant portion of HRS § 501-82 as follows:

> Every applicant receiving a certificate of title in pursuance of a decree of registration, and every subsequent purchaser of registered land who takes a certificate of title for value and in good faith, hold the same free from all encumbrances *except those noted on the certificate in the order of priority of recordation*[.]

Waikiki Malia, 75 Haw. at 389, 862 P.2d at 1060 (emphasis and brackets in original).

transfer certificate of title, the current property owner held the property free from the restriction.  Id. at 390-92, 862 P.2d at 1060-61.

Similarly, in United States v. Fullard-Leo, 156 F.2d 756 (9th Cir. 1946), the United States Court of Appeals for the Ninth Circuit applied Hawaii's Land Court Registration Statute in rejecting the United States's claim that it had title to Palmyra Island.  The Ninth Circuit upheld the trial court's decision that the Land Court's entry of a decree registering title to Palmyra Island in favor of Cooper, a private party, in proceedings in which the Territory of Hawai'i had participated and disclaimed any interest, was binding on the United States and precluded its claim of title.  Id. at 757, 759-60.  In support of it holding, the Ninth Circuit relied upon the conclusive effect of Land Court registration in quieting title to property:

> Under the land registration laws of the Territory, embraced in Chapter 154, Revised Laws of Hawaii 1905, a decree of registration of absolute title binds the land and quiets the title thereto.  The decree is conclusive upon the world, including the Territory.  If it appears that the public may have a claim adverse to that of the applicant for registration, special notice of the application, in addition to the published notice provided for, is required to be served on the territorial attorney general.  Accordingly there can be no doubt that the Territory was properly made a party to the Cooper application and that the attorney general was authorized to appear on its behalf.
>
> It is essential in this connection again to emphasize the position occupied by the Territory in relation to the public lands.  If the land involved in the Cooper application was public property, full authority in respect of its management, administration and disposition had been committed to the Territory by Congress by the terms of §§ 91 and 73 of the Organic Act, and along with the authority went the duty of asserting and maintaining the true state of the title if, indeed, it were thought to rest in the public.  Hence the Territory, in disclaiming any interest, was functioning in its capacity as trustee of the public lands, of which, essentially, it was the beneficial owner.  And as was observed on the first appeal, it has been the practice of the Territory to resort to the Land Court for registration or confirmation of title to public lands where adverse claims thereto are asserted.

Id. at 759-60 (citations and footnote omitted).

D.

At oral argument, the State conceded that the government's reservation of mineral or metallic mines constitutes an encumbrance on property. The State further conceded that the reservation of mineral or metallic mines is an alienable right, which the State could convey, relinquish, or waive at its option. We proceed with our analysis in light of these concessions by the State.

In this case, the Trustees, Petitioners' predecessors in interest, filed an application with the Land Court in 1934 to register lands which included the Subject Property. This proceeding culminated in the Land Court's issuance in 1938 of the Original Decree and the Original Certificate of Title. The Territory, the State's predecessor in interest, (1) actively participated in this registration proceeding; (2) filed an "Answer and Claim" which asserted the Territory's claims of interest in the lands sought to be registered; (3) did not assert any claim for a reservation of mineral or metallic mines on the Subject Property; and (4) had its claims resolved through settlement by agreement with the Trustees or by exchange deeds filed in the record. The Territory also did not appeal from the Original Decision or the Original Decree.

We conclude that the Land Court's 1938 registration of the Subject Property, without noting any government reservation of mineral or metallic mines as an encumbrance in the Original Decree or the Original Certificate of Title, extinguished the reservations of mineral or metallic mines regarding the Subject Property set forth in Royal Patent No. 5616, Royal Patent No. 5693, and Grant No. 550. See RLH § 5041 (predecessor of HRS § 501-82). The Territory had the opportunity to assert a claim for the reservation of mineral or metallic mines on the Subject Property during the Trustees' 1934 registration proceeding, but failed to assert such a claim and resolved the adverse claims it did raise through agreement with the Trustees. By virtue of the Original Decree and the Original Certificate of Title,

Petitioners hold the Subject Property free from any encumbrance for the reservation of mineral or metallic mines set forth in Royal Patent No. 5616, Royal Patent No. 5693, and Grant No. 550. See Waikiki Malia, 75 Haw. at 376-77, 389-92, 862 P.2d at 1054, 1059-61; Honolulu Memorial Park, 50 Haw. at 192-94, 436 P.2d at 209-10; see also Fullard-Leo, 156 F.2d at 757, 759-60.

Although the Kamehameha III Deed did not contain an express reservation of mineral or metallic mines in favor of the government, the State argues that this reservation was implicit and "self-effectuating." We need not, and therefore do not, decide the State's contention that the Kamehameha III Deed should be read as including an implicit, self-effectuating government reservation of mineral or metallic mines. Assuming arguendo that the Kamehameha III Deed can be read in this fashion, we conclude that the Original Decree and the Original Certificate of Title extinguished any implicit reservation of mineral or metallic mines derived from the Kamehameha III Deed just as they extinguished the express reservations contained in Royal Patent No. 5616, Royal Patent No. 5693, and Grant No. 550. Accordingly, Petitioners hold the Subject Property free from any encumbrance for the reservation of mineral or metallic mines.[10/]

---

[10/] Because we conclude that the State does not have a reserved ownership interest in mineral and metallic mines on the Subject Property, we need not reach the State's contention that its claimed reservation of mineral and metallic mines includes geothermal rights. Indeed, we would not reach this issue even if we had come to the opposite conclusion regarding the State's ownership of mineral and metallic mines on the Subject Property. There is no indication that the Subject Property contains any known geothermal resources. Thus, with respect to the instant Land Court proceeding, the issue of whether a reservation of mineral and metallic mines includes geothermal rights is an abstract question that is not directly in controversy. Accordingly, this case is not a proper vehicle to decide that issue. See Wong v. Bd. of Regents, Univ. of Hawaii, 62 Haw. 391, 394-95, 616 P.2d 201, 204 (1980) (stating that the duty of the court "is to decide actual controversies . . . and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it"); Kapuwai v. City and County of Honolulu, 121 Hawai'i 33, 41, 211 P.3d 750, 758 (2009) (concluding that the "issuance of an advisory opinion on an unripe issue [over which no current controversy exists] implicates concerns 'about the proper -- and properly limited -- role of courts in a democratic society' and contravenes the 'prudential rules of judicial self-governance'" (citation omitted)).

E.

Relying on a Minnesota decision, Estate of Koester v. Hale, 211 N.W.2d 778 (Minn. 1973), the State asserted in its opening brief and at oral argument that the Land Court registration of the Subject Property could not extinguish the government's reservation of mineral and metallic mines because a certificate of title cannot create an interest in land and because extinguishing the government's reservation would result in manifest injustice. In Koester, a certificate of title was issued that mistakenly included a tract of land from an adjoining property that the applicant for registration (the defendants' predecessor in interest) had not acquired. Koester 297 N.W.2d at 779-81. The court held that "under the peculiar facts of this case" -- where the owners of the adjoining property had not received notice as a party who may claim an adverse interest in the lands to be registered; the owners of the adjoining property did not make any appearance in the registration proceeding; and there was no dispute that including the tract of land from the adjoining property in the applicant's certificate of title was a mistake and resulted in enlarging the area of land beyond that which the applicant had acquired -- it would be a manifest injustice to permit defendants to maintain title to the tract of land from the adjoining property based on the certificate of title. Id. at 781-82.

We are not persuaded by the State's reliance on Koester. First, Koester, a Minnesota decision, is not binding on this court. More importantly, Koester, which the court acknowledged was based on its peculiar facts, is distinguishable. Unlike in Koester, the Territory appeared and participated in the registration proceeding, asserted adverse claims of interest, and reached agreement with the Trustees regarding its adverse claims. In addition, unlike in Koestner, the Original Decree and the Original Certificate of Title served to extinguish an encumbrance on the Subject Property concerning the government's reservation of mineral or metallic mines; it did not grant the Trustees title

to additional areas of land to which they were not entitled.  We see no manifest injustice in concluding that the Land Court registration of the Subject Property extinguished the express government reservations and any implicit government reservation of mineral or metallic mines.

We are also unpersuaded by the State's argument that the government's reservation of mineral or metallic mines is a "burden and incident" on land under HRS § 501-81 (2006)[11] that cannot be extinguished by registration.  The State does not cite any case holding that a government's reservation of mineral or metallic mines is a non-extinguishable burden and incident of land under the facts presented here.  In addition, Petitioners argue and the State does not dispute that during the time relevant to the Trustees' application for registration, from the filing of the application in 1934 to obtaining the Original Decree and the Original Certificate of Title in 1938, there was no statute in effect that gave the Territory an ownership interest in mineral or metallic mines.[12]  Therefore, the State

---

[11] HRS § 501-81 (successor of RLH § 5040 (1935)) provides:

> Legal incidents of registered land.  Registered land, and ownership therein, shall in all respects be subject to the same burdens and incidents which attach by law to unregistered land. Nothing in this chapter shall in any way be construed to relieve registered land or the owners thereof from any rights incident to the relation of husband and wife; or from liability to attachment or mesne process or levy on execution; or from liability to any lien of any description established by law on land and the buildings thereon, or in the interest of the owner in land or buildings; or to change the laws of descent except as provided in section 501-71; or the rights of partition between coparceners and other cotenants; or the right to take the same by eminent domain; or to relieve such land from liability to be recovered by a trustee in bankruptcy under the provisions of law relating to preferences; or to change or affect in any way any other rights or liabilities created by law and applicable to unregistered land; except as otherwise expressly provided in this chapter.

[12] "An Act to Organize the Executive Department of the Hawaiian Islands," pt. I, Ch. VII, art. II, § 6, S.L. 1845-1846, pp. 100-101 (reproduced in 2 RLH 2191 (1925)), prescribed the form for all royal fee simple patents and required that such patents include the following language: "excepting and reserving to the Hawaiian government, all mineral or metallic mines, of every description." In re Robinson, 49 Haw. 429, 431, 421 P.2d 570, 572-73 (1966) (quoting S.L. 1845-1846, pp. 100-101).  This provision was

(continued...)

has failed to demonstrate that the government's reservation of mineral or metallic mines was an incident and burden of property that could not be extinguished by the issuance of the Original Decree and the Original Certificate of Title.[13]/

F.

In sum, we hold, under the circumstances of this case -- where the Territory actively participated in the Trustees' application for registration; the Territory raised certain adverse claims, but did not assert a claim for the reservation of mineral or metallic rights and agreed to resolve the claims it did raise; and there was no general law in effect that precluded the Territory from relinquishing a reservation of mineral or metallic mines -- that the Land Court's issuance of the Original Decree and the Original Certificate of Title, which did not identify a reservation of mineral or metallic mines in favor of the Territory as an encumbrance on the Subject Property, extinguished the express reservations and any implicit

---

[12]/(...continued)
repealed in 1859. See 2 RLH 2190-91 (1925); Robinson, 49 Haw. at 442-43, 421 P.2d at 578. The next Hawai'i statute dealing with the government's reservation of mineral rights was not enacted until 1963, long after the Original Decree and the Original Certificate of Title had been entered. See 1963 Haw. Sess. Laws Act 11, §1 at 10 (codified at HRS § 182-2 (2011) (reserving minerals on State lands to the State, but authorizing the board of land and natural resources to release, cancel, or waive the reservation if it deems the land use other than mining is of greater benefit to the State).

[13]/ Both the State and Petitioners cite In re Robinson, 49 Haw. 429, 421 P.2d 570 (1966), in support of their argument. However, Robinson is not on point and does not provide meaningful guidance for our decision. Elizabeth Cockett Robinson filed an application in Land Court to register title to two lots derived from Land Court Awards with Royal Patents. Id. at 429-30, 421 P.2d at 572. The State appeared in the original registration proceeding and claimed its right to government reservations of mineral or metallic mines, which were set forth in the Royal Patents but not in the corresponding Land Commission Awards. Id. at 430 & n.2, 421 P.2d at 572 & n.2. The Land Court denied the State's claim, and the State appealed. Id. at 430, 421 P.2d at 572. The Hawai'i Supreme Court held that the State was entitled to have the reservations of mineral or metallic mines noted as encumbrances on the original decree of registration. Id. at 441, 421 P.2d at 577. The supreme court in Robinson did not address the question of whether the Land Court's issuance of an original decree and an original certificate of title that does not contain a government reservation of mineral or metallic mines serves to extinguish such a reservation where the State or the Territory participated in the original registration proceeding and did not assert a claim for the reservation of mineral or metallic mines.

18

reservation of mineral or metallic mines on the Subject Property. Accordingly, we affirm the Land Court's denial of the State's claim that it owns all mineral and metallic mines on the Subject Property.

II.

A.

In its answer to the Amended Petition, the State asserted that it had reserved (1) "all right, title, interest, or claim to waters having their source upon or flowing over or under the property"; and (2) "an easement for the free flowage of any waters through, over, under, and across the property[.]" The Land Court found that the State "has reserved an interest in water rights, if any, that may affect the [Subject Property]," but it also found that "the interest of the State of Hawai'i, if any, is not an easement of encumbrance upon registered title."

On appeal, the State contends that (1) pursuant to the public trust doctrine, the State has reserved ownership of water in natural watercourses and rivers, and (2) it *therefore must follow* that the State is entitled to have an easement for the free flowage of waters noted as an encumbrance on the registered title for the Subject Property. Based on this reasoning, the State argues that the Land Court erred in denying its claim for an easement for the free flowage of waters to be noted as an encumbrance on the Subject Property.

While the State's ownership of reserved water rights under the public trust doctrine is established by Hawai'i precedents, the State provides no persuasive support for its argument that the ownership of such water rights means that the State is entitled to have an easement for the free flowage of waters noted as an encumbrance on the Subject Property. We affirm the Land Court's decision to deny the State's claim for a reserved easement for the free flowage of waters on the Subject Property.

B.

The Hawaiʻi Supreme Court has recognized that under the public trust doctrine, the State retains ownership of water rights in conveyed property. The supreme court, in <u>In re Water Use Permit Applications</u>, 94 Hawaiʻi 97, 9 P.3d 409 (2000) (<u>Waiāhole I</u>), stated:

> In <u>McBryde Sugar Co. v. Robinson</u>, 54 Haw. 174, 504 P.2d 1330, <u>aff'd on reh'g</u>, 55 Haw. 260, 517 P.2d 26 (1973), <u>appeal dismissed and cert. denied</u>, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 (1974), we contemplated the public interest in water resources. Consulting the prior laws and practices of this jurisdiction, we observed that, in granting land ownership interests in the Māhele, the Hawaiian Kingdom expressly reserved its sovereign prerogatives "[t]o encourage and even to enforce the usufruct of lands for the common good." <u>See id.</u> at 184-86, 94 S.Ct. 3164 504 P.2d at 1337-39 (quoting Principles Adopted By The Board of Commissioners To Quiet Land Titles In Their Adjudication Of Claims Presented To Them, 2 Statute Laws of His Majesty Kamehameha III (SLH) 81, 85 (1847), <u>reprinted in</u> 2 Revised Laws of Hawaii (RLH) 2124, 2128 (1925) [hereinafter Land Commission Principles]). "The right to water," we explained,
>
>> is one of the most important usufruct of lands, and it appears clear to us that by the foregoing limitation the right to water was specifically and definitely *reserved for the people of Hawaii for their common good in all of the land grants.*
>>
>> Thus by the Māhele and subsequent Land Commission Award and issuance of Royal Patent right to water was not intended to be, could not be, and was not transferred to the awardee, and *the ownership of water in natural watercourses and rivers remained in the people of Hawaii for their common good.*
>
> <u>Id.</u> at 186-87, 504 P.2d at 1338-39 (footnote omitted) (emphases added). In <u>Robinson v. Ariyoshi</u>, 65 Haw. 641, 658 P.2d 287 (1982), we elaborated on our <u>McBryde</u> decision, comparing the retained sovereign "prerogatives, powers and duties" concerning water to a "public trust":
>
>> [W]e believe that by [the sovereign reservation], *a public trust was imposed upon all the waters of the kingdom.* That is, we find the public interest in the waters of the kingdom was understood to necessitate a retention of authority and the imposition of a concomitant duty to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses. This is not ownership in the corporeal sense where the State may do with the property as it pleases; rather, we comprehend the nature of the State's ownership as a retention of such *authority to assure the continued existence and*

20

> *beneficial application of the resource for the common good.*

Id. at 674, 658 P.2d at 310 (emphases added).

Waiāhole I, 94 Hawaiʻi at 128-29, 9 P.3d at 440-41 (footnote omitted; emphasis and brackets in original).

The State cites its reserved water rights under the public trust doctrine as the basis for its entitlement to an easement for the free flowage of waters over the Subject Property. The State, however, fails to explain why the existence of reserved water rights under the public trust doctrine entitles the State to have an easement for the free flowage of waters noted as an encumbrance on the Subject Property.

As Petitioners argue, the State has not provided any specifics regarding the nature and scope of the flowage easement it seeks. The State has not identified where the requested flowage easement would run over the Subject Property or what actions affecting the Subject Property the State would be permitted to take under the requested easement.

Although the State attempts to justify its asserted easement as necessary for the performance of its public trust duties, it fails to demonstrate that the notation of an easement for the free flowage of waters as an encumbrance on the Subject Property at the present time and in the context of this case is needed to perform such duties. The State has not identified any surface or underground water feature on the Subject Property, much less any water whose free flowage has been impeded or threatened. Moreover, the public trust water rights held by the State burden and attach to the Subject Property by operation of law and cannot be extinguished by the failure to identify the State's public trust interest as an encumbrance on the registered title. See HRS § 501-81 ("Registered land, and ownership therein, shall in all respects be subject to the same burdens and incidents which attach by law to unregistered land.").

Petitioners argue that the notation of a non-specific State easement for the free flowage of waters as an encumbrance

on the Subject Property would unfairly and unnecessarily cloud their title. Petitioners contend that such an easement could potentially entitle the State to flood the Subject Property without any recourse by Petitioners. They further argue that the Commission on Water Resource Management, which was established under HRS Chapter 174C to manage the State's public trust water resources, is a more appropriate forum than the Land Court to determine whether the State would be entitled to a free flowage easement. The State does not provide a response that adequately or effectively addresses Petitioners' arguments.

We conclude that the State has failed to demonstrate its need or entitlement to have an easement for the free flowage of waters noted as an encumbrance on the Subject Property. We therefore affirm the Land Court's decision to deny the State's claim for such a reserved easement.

CONCLUSION

For the foregoing reasons, we affirm the Land Court's "Decision and Order" set forth in its "Findings of Fact, Decision and Order (Map 176)" and the Land Court's "Decree (Map 176)."

Julie H. China
Linda L.W. Chow
(Donna H. Kalama with
 Julie H. China on the brief)
Deputy Attorneys General
for Respondent-Appellant
State of Hawai'i

Jennifer A. Benck
Mark K. Murakami
(Christopher J. Cole with
 Mark K. Murakami on the brief)
for Petitioner-Appellee
James Campbell Company LLC

James J. Bickerton
(Barry A. Sullivan with him
 on the brief)
(Bickerton Lee Dang & Sullivan
 A Limited Liability Law
 Partnership)
for Petitioner-Appellee
James C. Reynolds, Inc.

Regan M. Iwao
(Lani L. Ewart and Ronald
 H. W. Lum, Jr., with him
 on the brief)
(Goodsill Anderson Quinn & Stifel
 A Limited Liability Law
 Partnership LLP)
for Petitioner-Appellee
Continental Pacific, LLC

Robert H. Thomas
(Damon Key Leong Kupchak Hastert)
on the brief for *Amicus Curiae*
Pacific Legal Foundation Hawaii Center